## DENTON *v.* BOOTH.

1. SALES—UNIFORM SALES ACT—COMPLETED SALE—QUESTION FOR JURY.

 Where defendants orally agreed to purchase a number of horses from plaintiffs at a cash price, and, pending examination of papers as to the breeding of some of them, defendants were given possession, when a dispute arose over the papers and the purchase price was never paid, the court below, in an action to recover, was not in error in submitting to the jury the question as to whether there was a completed sale under the uniform sales law (chapter 228, 3 Comp. Laws 1915).

2. AMENDMENTS—PLEADING—FORM OF ACTION.

 Although plaintiffs commenced their action in assumpsit, the court below was not in error in regarding the action as one in tort, in view of the liberal provisions of the statute which permits amendments even in the Supreme Court.

3. PARTNERSHIP—REGISTRATION—CERTIFICATE—STATUTES.

 Although it has been held that the members of a copartnership who have not complied with the provisions of Act No. 164, Pub. Acts 1913 (3 Comp. Laws 1915, § 6354 *et seq.*), may not prosecute an action under a contract, *held*, that the effect of the statute should not be extended to actions founded on tort; it being in derogation of common law rights.

Error to Chippewa; Fead, J. Submitted January 30, 1918. (Docket No. 30.) Decided July 18, 1918.

Case by William L. Denton and another, copartners as W. L. Denton & Son, against Arthur Booth and others for the conversion of certain horses. Judgment for plaintiffs. Defendants bring error. Affirmed.

*John A. McMahon* and *Herbert L. Parsille,* for appellants.

*Davidson & Hudson*, for appellees.

The plaintiffs in this case were copartners doing business under the firm name of W. L. Denton & Son and so described themselves in the declaration. Defendants are likewise copartners. Both plaintiffs and defendants were engaged in the buying and selling of horses. On April 1, 1916, plaintiffs were in possession of 13 horses which had been the subject of negotiations between themselves and defendants for some time. With reference to what occurred on that day, plaintiff Ernest L. Denton testified:

"They looked them over carefully, took each horse by itself out of the barn in the open air. I finally agreed that I would accept $1,900 for the entire lot. It was to be a spot cash deal.

"*Q.* What if anything was said at that time about the delivery of the horses?

"*A.* Why, the transaction took place on Saturday after banking hours. They came to my barn and we came to an understanding for $1,900 for the horses and they insisted that they should take part of the horses which I submitted to and they did. I was to furnish certain papers for these horses and on turning over the papers they were to pay me $1,900. They were to meet me in the Central Savings Bank after supper that evening, which was done. They gave me a check payable to A. Denton, and I objected to the check at the time, and they said 'keep it, we want to have Judge Holden look over the papers. We know nothing about the breeding of the horses.' I replied 'Well, you can keep the check, too. I care nothing about a check in this way.' They said, 'We will pay the $1,900 as soon as Judge Holden looks over the papers.' * * *

"*Q.* And in the evening, before making payment, what did they require about the examination of the papers?

"*A.* They required that I should turn over the papers to them and wait until Monday morning to let Judge Holden look at them as they didn't know anything about the breeding of horses themselves."

Defendant Booth testified in part as follows:

"I said: 'Here, now, before we go any further is everything O. K. on those horses?' First, I asked him if he owned the horses and he said he did; that there wasn't a cent against them. Then I told him that we didn't want to have any baby plays, we wanted to know if the papers were right, if everything was right before we would go any further, and he answered me that he had everything because we claimed that the horses * * *

"I asked him if he had all the necessary papers, also if he owned the horses. He said he owned the horses and there wasn't a cent against them and he had all the necessary papers for the stallions and the mares. At that time there was nothing said about the exact minute he was to get his money. Simply the price agreed upon, $1,900. * * *

"We met Denton again on Monday and I spoke to him along the lines of the papers. I told him of the conversation I had with Royce and I spoke to him about the papers and the transfers and he took some of the papers out of his pocket and he wanted to transfer the horses to us on the side of the building there, on the corner of Oka and Spruce streets, and we suggested that we had better go to somebody else and have it done in the proper way. He was going to make the transfers and everything there, on the side of the building. There was nothing to that, he said. So at that time we suggested that he go to Holden's office and come to us with proper papers, and we would give him his check for the $1,900.

"Right after the conversation we, Denton, Levine, and myself, went to Holden's office. When we went to Holden's office Denton had the papers and he talked to Holden along the lines of getting the papers. Holden looked the papers over and said, 'The papers for three of them—the three mares, are all right but for the two stallions, the proper transfers have not been made to Denton,' and that he could not transfer them to us until they had been transferred to him, and he produced a form at that time with some signatures on it and Holden turned it down. * * *

"*Q.* Well, you didn't personally say anything about the papers? Whether they were good or bad?

"*A.* I don't care what was said—anything about the papers—

"*Q.* Well, did you or didn't you?

"*A.* Why, I didn't say very much about the papers.

"*Q.* Well, what did you say about the papers, if you said something?

"*A.* Well, I don't think I said anything about the papers.

"*Q.* Well, Ike did, then, didn't he?

"*A.* Why, he just looked the papers over and—

"*Q.* I am talking about what Ike said about the papers, if you didn't say anything?

"*A.* I don't know what he said about them.

"*Q.* Did he say something?

"*A.* I don't know, I'm sure.

"*Q.* Did Ike say he was satisfied with the papers that night?

"*Q.* Well, you don't know about that?

"*A.* Yes, sir.

"*Q.* Said he was satisfied?

"*A.* Yes, sir.  *   *   *

"*Q.* Well, then, it was definitely arranged that you would pay him the money Tuesday?

"*A.* Yes, sir.

"*Q.* That was absolutely definite?

"*A.* Yes, sir.

"*Q.* And the deal was closed?

"*A.* And he would return the check for $500.

"*Q.* And that was the end of it, there wasn't anything more to do except to turn over the money?

"*A.* As far as I remember now.

"*Q.* Now, did you accept those papers on your own judgment or on Ike's?

"*A.* On Ike's.

"*Q.* What?

"*A.* Well, on Ike's judgment more than on mine.
*   *   *

"*Q.* Then, after talking with Denton at the bank you knew that same evening there were some papers missing which ought to be there, did you?

"*A.* These transfers?

"*Q.* Yes.

"*A.* Yes, sir.

"*Q.* You knew they were missing this same evening?

"*A.* Yes, sir."

Isaac Levine, another defendant, testified:

"Afterwards we accepted the papers and closed the deal. I did not look those papers over and accept them from my own knowledge of the papers, I accepted them from Mr. Denton's knowledge. He said that the papers were all right and that he would furnish everything. * * *

"Q. And I understand you to say that in some one of the talks on Monday or Tuesday it would be perfectly satisfactory if Mr. Denton got these transfers on the stallions within 30 or 60 days?

"A. Yes, sir.

"Q. And then, before the sale was had, your understanding was that Mr. Denton was to get the transfers?

"A. Yes, sir.

"Q. And any time within 30 or 60 days would be sufficient?

"A. Would be sufficient, providing he promised to do it?

"Q. Did he promise to do it?

"A. No.

"Q. Then I understand you that he didn't promise to do it?

"A. He didn't promise later in the week, but he promised on Saturday night.

"Q. Then do I understand on Saturday night he promised to get the transfers?

"A. Yes, sir."

It appears that after the talk on the evening of the first of April, which was Saturday, plaintiffs and defendants met in the office of Judge Holden on April 3d, where it was discovered that as to the two horses, Picador, and Lord of the Vail, Second, plaintiffs had no transfer of title from their vendors to themselves. Defendants then demanded that they leave $400 of the purchase price which had been agreed upon in some bank to be forfeited in case they did not secure such transfers. Plaintiffs offered to leave $100 for such purpose but this was not agreeable to defendants. In the meantime some of the horses had been transferred

to the possession of the defendants on Saturday and some on Monday morning. Being unable to agree, a verbal demand for the return of the horses was made by plaintiffs on defendants on April 3d, and on April 5th, a written demand was served upon them in the following language:

"Referring to our negotiations in reference to the proposed sale by W. L. Denton and Son to yourselves, of thirteen head of horses, it now appears that for various reasons you are unwilling to pay the purchase price, although at your suggestion the horses were taken to your barn to be kept pending an examination of certain papers by your attorney. We now demand immediate return of the horses, and in case of your refusal to return them to us we will hold you responsible for the full value of the horses, and in that connection we will not be bound by the proposed sale price.

"Yours very truly,

"WILLIAM L. DENTON and SON,

"by ERNEST L. DENTON."

Redelivery of the horses was refused by the defendants and they were, on April 8th, sold at public auction by defendants for their own account for $2,406. On the same day suit was commenced by plaintiffs in assumpsit for the value of the horses under the claim that defendants had unlawfully converted them to their own use. To this declaration defendants filed a plea of the general issue with notice thereunder that they would show, among other things:

"That plaintiffs are not entitled to maintain this suit because they have not made and filed with the county clerk of said county a statement showing their copartnership and who constitutes it as provided by law."

The case came on to be heard before the court and a jury when a motion was made that plaintiffs' suit be dismissed because, while suing as copartners they have not filed an affidavit of copartnership as required by

law. This question was reserved and the case proceeded. Under the evidence, the court submitted to the jury the question whether there had been a completed sale, charging them that if they found a completed sale had been effected by what had been said and done by the parties, plaintiff might recover the purchase price agreed upon, $1,900 less whatever sum the jury might find defendants had lost by reason of plaintiffs' failure to furnish the transfers of title as to the stallions, Picador and Lord of the Vail, Second; that if they should find such sale

"contingent upon Mr. Holden's accepting or rejecting the papers then, inasmuch as Mr. Holden rejected them as they stood, there would be no sale."

The jury in answer to the special question:

"Was there a completed sale of the horses in question to the defendants?"

answered the same: "No," and returned a verdict in favor of the plaintiffs in the sum of $2,206.05. This verdict was rendered on September 18, 1916, and on the same day plaintiffs filed a motion to amend the *præcipe* and verdict as follows:

"On September 18, 1916, at the opening of court, counsel for plaintiffs presented a motion in writing asking the court to amend the *præcipe* by striking out the words 'action of assumpsit' and inserting in place thereof the words 'action of trespass on the case,' also to amend the journal entry of the verdict of the jury so far as necessary to make it in form a verdict in trespass on the case instead of a verdict in assumpsit."

On November 8th, the motion to amend was denied, the court saying:

"I do not deem the form of action of any consequence in the determination of the reserved question. It would not be reasonable to hold that the technicalities of a mere form of action would validate acts or confer rights which, under the same facts would be

illegal or barred under another form of action, the essential difference between the action being found in a fiction of law. The transaction itself, and not the words used to designate it or to describe the form of action based upon it, governs the right of the plaintiffs to recover."

With reference to the reserved question, the court held that inasmuch as under the verdict of the jury no completed contract was made, the plaintiffs were not precluded by the statute from bringing suit to recover the value of the property which defendants had unlawfully converted, and thereupon entered judgment in accordance with the verdict of the jury. This judgment is now reviewed in this court under 36 assignments of error.

BROOKE, J. (*after stating the facts*). It is the contention of appellant that under the uniform law relative to the sale of goods, chapter 228, 3 Comp. Laws 1915, there was in the case at bar a completed sale and the court was in error in submitting that question to the jury. Under the testimony above quoted we are of opinion that the court properly submitted this question. It is, we think, apparent that the minds of the parties never fully met as to what should be required of the plaintiffs with reference to the papers showing breeding and transfers of title of the two stallions named. If this question was properly submitted and properly decided by the jury there remains but one matter for determination and that is whether the plaintiffs are debarred from prosecuting their action because of the provisions of Act No. 164, Pub. Acts 1913 (3 Comp. Laws 1915, § 6354 *et seq.*). We do not overlook the contention of the appellants with reference to the alleged errors of the court in his instructions to the jury upon the question of rescission. Under the finding of the jury that no completed sale had been made it follows that there was no contract

to rescind, and that when the demand was made for the return of the horses to the plaintiffs, defendants were holding them, not under any title acquired by the antecedent negotiations of a sale, but simply pending those negotiations.

Under the liberal provisions of our statute which permits amendments even in this court, in the interests of justice, we have no doubt that the court below was not in error in regarding the action as one in tort rather than in assumpsit.

Coming, then, to the provisions of the statute, can it be said that the members of a copartnership who have failed to comply with the law in filing a certificate in writing with the county clerk containing the required information as to the details of the copartnership, are prevented from using the courts of the State for the purpose of redressing a wrong? We think not. It would, we think, hardly be claimed that had defendants stolen the 13 horses from a barn of the plaintiffs, the plaintiffs, even though they had not filed the certificate required by law, could not have maintained an action in replevin or for a wrongful conversion of the animals. We are not unmindful of the fact that we have held (*Maurer* v. *Greening Nursery Co.*, 199 Mich. 522) that the members of a copartnership who have not complied with the act cannot prosecute an action under a contract. We do not think, however, that the effect of this statute should be extended, it being in plain derogation of common law rights.

Judgment is affirmed.

BIRD, MOORE, STEERE, FELLOWS, and STONE, JJ., concurred. OSTRANDER, C. J., and KUHN, J., did not sit.