WINGET *v.* GRAND TRUNK WESTERN RAILWAY CO.

1. PARTNERSHIP—CERTIFICATE—ASSUMED NAME.

Where the death of the father dissolved the partnership between a father and son, and the latter bought his father's interest from the heirs and continued the business under the same name, which contained his surname, there was thereafter no question of partnership involved under the provisions of Act No. 164, Pub. Acts 1913 (2 Comp. Laws 1915, § 6354 *et seq.*), nor was he doing business under an assumed or fictitious name within the provisions of Act No. 101, Pub. Acts 1907 (2 Comp. Laws 1915, § 6349 *et seq.*).

On noncompliance with statute requiring filing of certificate of partnership as affecting right to maintain action arising out of tort, see note in 2 A. L. R. 119.

2. SAME—FAILURE TO FILE NO BAR TO TORT ACTION.

Where plaintiff was doing business under an assumed name, his failure to file a certificate in compliance with Act No. 101, Pub. Acts 1907, would not bar him from bringing an action *ex delictu.*

3. CARRIERS—DELIVERY WITHOUT SURRENDER OF BILL OF LADING— LIABILITY AS CARRIER OR WAREHOUSEMAN—QUESTION OF LAW.

In an action by a shipper against the initial carrier under the Carmack Amendment (34 U. S. Stat. p. 584) for the wrongful delivery by the terminal carrier of a carload of beans without requiring the surrender of the bill of lading, where the facts are undisputed, the question of whether the negligence complained of is that of a common carrier or a warehouseman is one of law for the court.

4. SAME—VARIANCE IMMATERIAL WHERE DEFENDANT NOT MISLED.

In such action, the case being submitted on stipulated facts, whether the court held that the wrongful delivery was made in the capacity of a common carrier or as a warehouseman, *held,* immaterial, since defendant was not misled by the variance nor prevented from making a full answer on the merits.

5. SAME—APPEAL AND ERROR.

Nor did the faliure of the court to more fully state to the jury the reason for directing a verdict constitute prejudicial error, both parties having moved for a directed verdict.

6. COURTS—FEDERAL STATUTES—FEDERAL DECISIONS CONTROLLING.

Interpretation of Federal laws rests with the Federal courts, and against conflicting decisions of the United States Supreme Court the decisions of State courts cannot control even in their own jurisdictions.

7. COMMERCE—CARMACK AMENDMENT—PURPOSE—CARRIERS.

The purpose of the Carmack Amendment (34 U. S. Stat. p. 584), properly construed, is to provide a more simple, safe, and certain method of determining rights and duties in the business of interstate commerce by adoption of a uniform negotiable order bill of lading that by reasonable business precautions not only the carrier and shipper, but any person may rely upon it with reasonable certainty and more readily protect themselves.

8. SAME—TRANSPORTATION—LIABILITY OF CARRIER FOR WRONGFUL DELIVERY.

Under said act the initial carrier is liable for the wrongful delivery by the terminal carrier without surrender of the original bill of lading, and it is immaterial whether its negligence was that of a warehouseman or a carrier, since it was not released from its delivery as a duty of transportation according to the terms of the shipping bill by which it received the goods and carried them to the terminal point.

9. CARRIERS—LIABILITY FOR REFUSAL TO DELIVER WITHOUT BILL OF LADING.

No liability could attach to the carrier for refusal to deliver without surrender of the original bill of lading, on telegraphic instructions merely from the consignee, without reasonable identification and indemnity, if demanded.

10. COURTS—FEDERAL COURTS—CIRCUIT COURT OF APPEALS.

While the decision of the circuit court of appeals is not imperatively binding on the State courts, it will be followed where it is in harmony with the decisions of the United States Supreme Court.

11. CARRIERS—LIABILITY OF CARRIER FOR DELIVERY WITHOUT BILL OF LADING—NELSON GRAIN CO. CASE OVERRULED.

In view of the trend of the decisions of the Federal courts upon the liability of the carrier for delivery without requiring surrender of the original bill of lading issued under the interstate commerce law, the rule announced in, *Nelson Grain Co.* v. *Railroad Co.*, 174 Mich. 80, can no longer be accepted as a binding precedent.

12. SAME—DAMAGES—ACTUAL VALUE MEASURE OF DAMAGES.

Though drafts attached to a bill of lading are for more than the value of the goods, the actual value of the shipment, less unpaid freight thereon, is the measure of recovery for wrongful delivery without surrender of the original bill of lading.

, Error to Genesee; Brennan (Fred W.), J. Submitted January 8, 1920. (Docket No. 27.) Decided April 10, 1920.

Case by Mahlon H. Winget, doing business as T. J.

Winget & Son, against the Grand Trunk Western Railway Company for misdelivery of a carload of beans. Judgment for plaintiff on a directed verdict. Defendant brings error. Affirmed, conditionally.

*Harrison Geer* (*William A. Geer*, of counsel), for appellant.

*Charles F. Meyler*, for appellee.

STEERE, J. This action was begun in the circuit court of Genesee county to recover from defendant as initial carrier the value of a carload of beans delivered to it for transportation and claimed to have been misdelivered. Trial was had before a jury on February 24, 1919, resulting in a judgment on directed verdict for the sum of $2,512.89.

The following letter to defendant's agent at the point of shipment shows in outline the nature and occasion of plaintiff's claim, for which a lengthy declaration in legal form was subsequently filed:

"T. J. WINGET & SON,
"Dealers in Grain, Beans and Seeds.
"LINDEN, October 14, 1912.
"W. S. WILSON, Agent Grand Trunk Railway,
"Linden, Michigan.
"*Dear Sir:* On June 28th, 1912, we shipped from your station Grand Trunk car No. 6580, loaded with beans. This car was billed from Arthur J. Thompson Company, to order Arthur J. Thompson Company, notify Hewitt & Son, Des Moines, Ia. This car has been delivered without the original bill of lading to which our draft for $1,890.62 is attached. We claim this amount due us and ask for a prompt settlement, otherwise this matter will be taken up with the interstate commerce commission.
"Yours truly,
"T. J. WINGET & SON,
"Per M. H. WINGET."

The propositions to which defendant's assignments of error are directed may be summarized as follows:

Plaintiff is precluded from maintaining this action because of failure to comply with the statute relative to doing business under an assumed name. Fatal variance appears between plaintiff's declaration and proofs. Defendant as common carrier is shown to have fully performed its duty. The trial court erred in directing a verdict for plaintiff without stating the reasons therefor. Plaintiff under no circumstances could recover an item of $137.50 with interest which was included in the judgment.

It appears undisputed that the carload of beans in question was delivered to defendant as initial carrier at Linden, Michigan, and left about June 28, 1912, reaching its destination at Des Moines on July 8, 1912, when Hewitt & Son of that city were promptly notified of its arrival by the terminal carrier, the Des Moines Union Railway Company. The shipment went forward under a standard order bill of lading, made out by plaintiff, naming the Arthur J. Thompson Company, to whom he had sold the carload, as both shipper and consignee, which he testified was "for the purpose of concealing the identity so that it could be transferred, and so forth, without the origin of the beans becoming known to Hewitt & Son." Plaintiff shipped these beans to fill an order given T. J. Winget & Son from the Flint office of the Thompson Company, which had branch offices in Flint, Chicago, Kansas City and at least one other place, in compliance with the following letter:

"FLINT, MICHIGAN, June 25th, 1912.
"T. J. WINGET & SON,
    "Linden, Michigan.
    "*Gentlemen:* You may ship the car of choice we have coming from you to order A. J. Thompson Company. Notify Hewitt & Son, Des Moines, Ia. Via C. M. & St. P. R. R. Be sure and see that the car is billed, 'allow inspection.' Send invoice and make draft

on A. J. Thompson Company at Kansas City, Mo.  Be
sure that the stock in this car is good and dry.

            "Yours truly,

               "A. J. THOMPSON COMPANY."

Following the shipment plaintiff sent the original
bill of lading with his draft on the Thompson Com-
pany attached for $1,890.62 (the original price of the
beans at $2.75 per bushel f. o. b.) through his bank
to Kansas City for collection, as directed by the letter
from its Flint office of June 25, 1912.

On receipt of notice from the terminal carrier at
Des Moines, Hewitt & Son inspected the beans but
declined to accept them owing to the quality, of which
they notified the Thompson Company's office at Chica-
go.  On July 15, 1912, the Thompson Company's office
at Flint advised Winget & Son of Linden of the com-
plaint, asking for some adjustment of price, which re-
sulted in an exchange of telegrams and plaintiff finally
agreed with the Thompson Company upon a reduction
of 20 cents per bushel, which proved acceptable to
Hewitt & Son, and he sent the Thompson Company a
check for $137.50, to which the reduction amounted.
On July 24, 1912, the following telegram was sent
Charles Hewitt & Son at Des Moines from the Thomp-
son Company's Chicago office:

"Just heard from shipper, accept your proposition,
twenty cents allowance.  This authority agent rail-
road deliver you car without lading.  Remit Chicago
correct basis deducting car service and freight.  An-
swer.  Arthur J. Thompson Company.  10/23 A. M."

This telegram was delivered by Hewitt & Son to
the agent of the Des Moines Union Railway Company
and the consignment was delivered to them on the
strength of it by the terminal carrier, without sur-
render of the bill of lading.  Shortly thereafter the
agent of the terminal carrier at Des Moines received
the following telegram from the Thompson Company:

"CHICAGO, ILL., July 24th, 1912.
"Agent, C. M. & St. P. Ry.,
　"Des Moines, Ia.
　"This will be authority to deliver G. T. car 6580 beans, consigned to A. J. Thompson to Chas. Hewitt & Sons without surrender of original bill of lading.
　　　　(Signed)　"ARTHUR J. THOMPSON CO."

Hewitt & Son promptly remitted the Thompson Company office for the beans.

After its issue the original bill of lading was never in the possession of the Thompson Company, Hewitt & Son or any other party than plaintiff and the banks through which it passed for collection with a draft attached. It was some time later returned dishonored. Learning by inquiry of Hewitt & Son that they had promptly paid the Thompson Company for the car of beans after accepting the same plaintiff found himself unable to get his pay from the Thompson Company which proved irresponsible and, as he states, "went bankrupt." Except the telegram on strength of which delivery was made, it is conceded that none of those communications between plaintiff, Thompson Company and Hewitt & Son relative to these beans after their arrival at destination and before delivery was brought to the attention of the carrier or any of its agents. Neither did Hewitt & Son know of plaintiff's interest in the transaction until he wrote them some time after they had paid the Thompson Company for the beans.

The shipping bill in question is a standard form of "order bill of lading" approved by the interstate commerce commission by a general order of June 27, 1908, which amongst other things provides, "The surrender of this original order bill of lading, properly indorsed, shall be required before the delivery of the property." The matter inserted in filling out the blank of special interest in this case is as follows:

"Consigned to order of the Arthur J. Thompson Company.

"Destination, Des Moines, State of Iowa, county of
. . . . . . . . . . . . . . . .

"Notify Hewitt & Son.

"At Des Moines, State of Iowa.

"Route C. M. & St. P. Car initial G. T. Car No. 6580.

"Weight subject to correction, 41250.

"250 bags beans.

"(Allow inspection).

(Signed) "THE ARTHUR J. THOMPSON CO., shipper.

"Per T. J. WINGET & SON.

"W. S. WILCOX, Agent.

"Per . . . . . . . . . . . . . . . .

"(This bill of lading is to be signed by the shipper and agent of the carrier issuing the same.)"

This was concededly signed by the shipper and agent as above indicated.

Upon the contention that plaintiff's action cannot be entertained because he was doing business under an assumed name, without having filed the certificate required of those doing business under an assumed name, it appears that Winget is his true surname, that he is the son of T. J. Winget, and had with his father conducted business at Linden for a number of years under the firm name of Winget & Son, that some time before the shipment involved here the father died, and plaintiff bought his interest in the business from the other heirs, continuing it under the same name as before.   That the death of the father dissolved the partnership there can be no question.  Its affairs were wound up and closed out, the surviving partner buying the interest of the deceased partner from those who inherited it.   He thereafter was the sole owner of the business.   No partnership existed when this shipment was made, neither did he then have any contract' relations with defendant personally or in his business name.   No question of partnership is involved under the stringent provisions of Act No. 164,

Pub. Acts 1913 (2 Comp. Laws 1915, § 6354 *et seq.*), as in *Maurer* v. *Nursery Co.*, 199 Mich. 522, and *Furstman* v. *Frank*, 206 Mich. 619. The preceding act, No. 101, Pub. Acts 1907 (2 Comp. Laws 1915, § 6349 *et seq.*), "to regulate the carrying on of business under an assumed or fictitious name," has been construed by this court as particularly directed to that class of enterprises operated under assumed, fanciful, elusive and misleading names, which contained no inkling of those connected with or conducting them, and declined to rigidly apply the statute against those disclosing in the business name adopted the true surname or names of some party or parties interested in and conducting an established, legitimate business. Of the former class are *Cashin* v. *Pliter*, 168 Mich. 386 (Ann. Cas. 1913C, 697); *Clark* v. *Holman*, 204 Mich. 62; and of the latter, *Axe* v. *Tolbert*, 179 Mich. 556; *Sauer* v. *Construction Co.*, 179 Mich. 618; *Cross* v. *Leonard*, 181 Mich. 24; *Zemon* v. *Trim*, 181 Mich. 130; *Hager* v. *Schliess*, 184 Mich. 472. We think the instant case more properly falls within the second class. It may be noted in passing that the legislature has since, to some extent, drawn the teeth of Act No. 101, Pub. Acts 1907, by Act No. 263, Pub. Acts 1919. Although so suggested by his counsel, we do not discover from this record that plaintiff had complied with said act No. 101 before commencing this action, nor is it material; but it does appear that his declaration sounds in tort, and it has been held that denial of the courts to those failing to file a certificate in compliance with the statute should not be extended to *ex delictu* actions. *Denton* v. *Booth*, 202 Mich. 215. We find no error in the denial of defendant's motion for a directed verdict because plaintiff had violated the assumed-name act in the particular claimed.

Defendant's claim of a fatal variance between plaintiff's declaration and proof is based on the contention

that the declaration only alleges a common carrier
duty while the proofs show a warehouseman's liability,
if any, owing to the delay in acceptance and removal
on the part of the consignee of the shipment after its
arrival and notice thereof by the carrier as directed.
The declaration in general terms alleges the transac-
tion as related, which is in its main features undis-
puted and stipulated, and without specifically alleging
defendant made the claimed wrongful delivery acting
either as a warehouseman or common carrier, charges
a tort in the particular that through its named termi-
nal carrier defendant wrongfully delivered the con-
signment "without requiring the surrender of the bill.
of lading, or payment of the draft as aforesaid, where-
by the plaintiff wholly lost his property aforesaid,"
and that a liability has accrued thereby to plaintiff
from the defendant "under and pursuant to the pro-
visions of the act of congress of June 29, 1906 (34
U. S. Stat. p. 584)," making proper reference to the
interstate commerce law, the Carmack amendment to
it, etc. To this defendant pleaded the general issue
with several notices of special defense, including the
claim that at the time of delivery the terminal car-
rier's responsibility was that of a warehouseman only.

Plaintiff squarely places his right to recover upon
the Carmack amendment, a Federal statute, and under
the undisputed facts in this case the question of
whether the negligence complained of is that of a
common carrier or a warehouseman is one of law for
the court. Numerous decisions of both Federal and
State courts are to be found upon that subject and
an examination of them makes plain that they cannot
all be reconciled. The recent work of Roberts on Fed-
eral Liability of Carriers takes note of that lack of
harmony and we think ably portrays the situation in
part as follows:

"Many State courts in construing the Carmack

amendment have held that the initial carrier is only liable for loss, damage or injury to property transported in interstate commerce while it is in the possession of the terminal carrier as such, and that when the terminal carrier holds the property as a warehouseman and damage then results, the initial carrier is not liable under the Federal statute. But these cases seem to be in conflict with the controlling decisions of the Federal Supreme Court.

"Under the act to regulate commerce, the term 'transportation' includes all services in connection with the receipt, delivery, elevation and transfer in transit, ventilation, refrigeration or icing, storage and handling of property transported. From this and other provisions of the Hepburn act congress recognized that the duties of carriers to the public included the performance of a variety of services that, according to the common law, were separable from the carrier's services as carrier, and in order to prevent overcharges and discriminations from being made under the pretext of performing such additional services, it enacted that, so far as interstate carriers by rail were concerned, the entire body of such services should be included together under the single term 'transportation' and subjected to the provisions of the act." 1 Roberts on Federal Liability of Carriers, § 338.

While matter can be found in some of the Federal decisions which may give some opportunity for contention to the contrary, we think the controlling decisions of the Supreme Court when directly dealing with the subject well sustain that view.

The case was submitted on stipulated facts supplemented by the testimony of plaintiff and both parties moved for a directed verdict on the undisputed evidence. Considering strictly the matter of variance, whether the court held that as a matter of law the undisputed evidence showed a wrongful delivery was made by the terminal carrier in the capacity of a common carrier or as a warehouseman could scarcely be said to mislead, even if it surprised, the adverse party, nor to prevent making full answer on the merits

to the matter concerning which such variance is claimed, which is one of the statutory tests (3 Comp. Laws 1915, § 12583). In 1 Michie on Carriers, p. 916, it is said:

"And an objection that a carrier was sued as such, whereas the evidence showed its liability to be that of a warehouseman, is untenable, where answer in confession and avoidance presented issue of liability as a warehouseman."

Defendant's contention that a verdict should have been directed because of variance is not tenable. Neither do we think under the situation presented by this record that failure of the court to more fully state to the jury the reasons for directing a verdict constituted prejudicial error as claimed.

Controlling interpretation of Federal laws rests with the Federal courts, as has been often held and always recognized by this court when occasion arose. *Perkett* v. *Railroad Co.,* 175 Mich. 253; *Thomas* v. *Blair,* 185 Mich. 422; *French* v. *Railway Co.,* 204 Mich. 578. Against conflicting decisions of the United States Supreme Court the decisions of State courts cannot control upon those questions even in their own jurisdictions. In the *French Case* we recently discussed the origin, nature and reason for the order bill of lading under the Carmack amendment as deducible from the Federal authorities. The Supreme Court of the United States has been frequently called upon to consider and define its purpose, function and effect, in varying aspects according to the facts of the case under consideration. Their import and general trend are fairly portrayed in chapters 17 and 18, relating to duties under the Carmack amendment and the Federal bill of lading, in volume 1 of Roberts' work on Federal Liability of Carriers. The following later cases are instructive and more or less in point: *Atlantic Coast Line R. Co.* v. *Riverside Mills,* 218 U. S.

186 (31 Sup. Ct. Rep. 164) ; *Adams Express Co.* v. *Croninger,* 226 U. S. 491 (33 Sup. Ct. Rep. 148, 44 L. R. A. [N. S.] 257) ; *Chicago, etc., R. Co.* v. *Miller,* 226 U. S. 513 (33 Sup. Ct. Rep. 155) ; *Kansas Southern R. Co.* v. *Carl,* 227 U. S. 639 (33 Sup. Ct. Rep. 391) ; *Atl. Coast Line* v. *Glenn,* 239 U. S. 388 (36 Sup. Ct. Rep. 154) ; *Chicago, etc., R. Co.* v. *Dettlebach,* 239 U. S. 588 (36 Sup. Ct. Rep. 177) ; *Southern R. Co.* v. *Prescott,* 240 U. S. 632 (36 Sup. Ct. Rep. 469) ; *Northern Pacific R. Co.* v. *Wall,* 241 U. S. 87 (36 Sup. Ct. Rep. 493) ; *Georgia, etc., R. Co.* v. *Blish Milling Co.,* 241 U. S. 190 (36 Sup. Ct. Rep. 541).

An excursion through the multitude of varying State court decisions and earlier Federal authorities upon the subject of duties and rights of common carriers and shippers discloses a field for abundant contention, but we think it now manifest from the above cases and others of like import that the evident intent and purpose of the act as properly construed is to provide a more simple, safe and certain method of determining rights and duties in the business of interstate commerce by adoption of a uniform negotiable order bill of lading of such definite character and legal import that by reasonable business precautions not only the carrier and shipper but any person, bank or other business concern interested may rely upon it with reasonable certainty and more readily protect themselves in the gigantic business of making and handling interstate consignments, which concededly is a fit subject of Federal control and regulation in the public interest generally. In *Adams Express Co.* v. *Croninger, supra,* it is said:

"The duty to issue a bill of lading and the liability thereby assumed are covered in full, and though there is no reference to the effect upon State regulation, it is evident that congress intended to adopt a uniform rule and relieve such contracts from the diverse regulation to which they had been theretofore subject."

Plaintiff was a "lawful holder" of a uniform order bill of lading issued by the initial carrier pursuant to requirements of the interstate commerce act. By it the carrier is made "liable to the lawful holder thereof for any loss, damage or injury to such property caused by it," but surrender of the original bill to the carrier "shall be required before delivery of the property." If the lawful holder, plaintiff was entitled to maintain an action for loss of the property whether his interest in the same was as owner, as security to him for an indebtedness, or otherwise. The fact that he was not consignor or consignee and held no direct contract relations with the carrier for transportation of the goods does not bar him from recovery for the loss of the property which the order bill of lading represented through fault of the carrier, provided he was the lawful holder of a bill of lading which entitled him to its delivery and imposed upon the carrier the duty to deliver it to him on proper identification and surrender of the original order.

"When goods have been misdelivered there is as clearly a 'failure to make delivery' as when the goods have been lost or destroyed." *Georgia, etc., R. Co.* v. *Blish Milling Co., supra.*

The statute cast upon defendant as initial carrier responsibility for the completed transportation according to the original contract of shipment evidenced by the bill of lading, which included delivery. The negligence in this case was that of the terminal carrier. Whether the terminal carrier by reason of the consignee's delay in removing could be regarded as holding the consignment in the capacity of a warehouseman in other particulars is immaterial here for it was not released from its delivery as a duty of transportation according to the terms of the shipping bill by which it received the goods and carried them to

the terminal point. Its negligence which caused loss of the goods to the lawful holder of the shipping bill was delivery under the circumstances shown without requiring production of the original bill. The telegram from the Thompson Company, on the strength of which delivery was made, was not even addressed to the carrier. It fairly advised that while the Thompson Company apparently assumed to act as consignor in directing delivery without the bill of lading, there was a shipper it had to hear from before doing so. Unless the agent assumed the Thompson Company referred to itself in the statement, "just heard from shipper," he had notice of an interested shipper other than the named consignor or consignee.

Certainly no liability could attach to the carrier in this case for refusal to deliver without surrender of the original bill of lading, and, we think, seldom if ever would liability arise in any case for such refusal, without reasonable identification and indemnity if demanded, under the present state of the law recognizing an order bill of lading as in effect *quasi*-negotiable paper representing the value of the shipment in the hands of the lawful holder. The latter proposition appears to be questioned by defendant and, in support of a doubt that the courts would protect the refusing carrier against demand of the consignor or owner, cite *McCotter* v. *Railroad Co.* (N. C.), 100 S. E. 326, where the owner shipped a carload of potatoes consigned to his own order, and recovered a judgment against the initial carrier for damage to the goods resulting from delay in transportation and refusal of the terminal carrier to deliver the same without production of the original bill of lading which had become lost or delayed in transmission. Issues of fact were involved under both claimed causes of delay. The owner applied to the initial carrier for direction to its terminal carrier to deliver the consignment, with

tender of a bond of indemnity, and such instructions were sent. Failure of the terminal carrier to deliver after receipt of such instructions was claimed. The terminal carrier was under the law but agent of the initial carrier and the supreme court of North Carolina held that on the facts presented—

"a failure to deliver the potatoes to the owner or his agent on a telegraphic message from the initial carrier that this be done without presentation of the bill of lading made at the request of the owner and consignor, would be sufficient to sustain the verdict on the issue."

We find no suggestion in this ruling that the terminal carrier's refusal would have been held culpable had no satisfactory protection by bond of indemnity been tendered, and no instruction to deliver received from the initial carrier. So far as any inference arises it is to the contrary.

It is earnestly contended for defendant that *Nelson Grain Co.* v. *Railroad Co.,* 174 Mich. 80, quadrates with the instant case and is controlling. Since that case was handed down by a divided court the Federal appellate courts, whose decisions are controlling in the final analysis, have in several decisions emphasized the important function of an order bill of lading in transportation and its significance as a test in these controversies over wrongful or non-delivery. In the recent case of *King* v. *Barbarin,* 249 Fed. 303, in which it is said the facts are practically the same as in the *Nelson Grain Co. Case,* cited by defendants there as here, as directly sustaining their contentions, the court did not find the *Nelson Grain Co. Case* persuasive and arrived at a contrary conclusion, saying in part as follows:

"The question thus is: Were petitioners, as between themselves and the carrier, the lawful holders of the bill of lading, entitling them to be recognized as such?
*   *   *

"Petitioners were in fact owners of the beans at the time of their delivery to the carrier. The latter delivered to them a bill of lading which was the symbol of the property named therein. * * * By the transaction in question Botsford & Barrett presumably acquiesced, to say the least, in petitioner's retention of the bill. The fact of such retention, under the circumstances shown, was, in our opinion, evidence of an intent on the part of petitioners to hold the title until the beans were paid for, so far as necessary to secure such payment, and of the consent of Botsford & Barrett thereto. * * * Under these circumstances, and in view of the practice of grain dealers to ship goods and collect therefor on draft accompanied by bill of lading, we think the carrier was not entitled, from the mere fact that Botsford & Barrett were named as shippers, conclusively to presume that petitioners had received payment for the beans, but was fairly charged with notice, not only that petitioners might at least not have received their pay, but of whatever claim they might turn out to have, so far as evidenced by their possession of the bill of lading.

"Had petitioners not taken back from the bank their discredited draft on Botsford & Barrett, the bank, in our opinion, would clearly be entitled to recovery. * * * In our opinion the rights of petitioners are not made less than those the bank would have had from the mere fact that their ownership antedated the shipment, and that the bill of lading was retained by them for the express protection of their antecedent ownership and right to receive pay before parting with title. The nature of the contract has not been changed, nor has the carrier been injured, by the fact that Botsford & Barrett were named in the bill of lading as consignors. Had they actually made the shipment, the rights of others would still be likely to intervene, as, for example, those of subsequent pledgees, to secure advancements, or those of petitioners, under actual delivery of bill of lading by Botsford & Barrett, to secure payment of their draft for the price of the beans. We think it clear that in the latter case petitioners would have been protected. We are not impressed that the protection is lost because their ownership antedated the shipment, and because the bill of lading was retained by them, instead of being manually turned

over to them by Botsford & Barrett. Petitioner's loss is due directly to the carrier's failure to observe its contract."

Strictly and technically considered it may be conceded, as counsel for defendant contends, that this decision of the Federal circuit court of appeals is not imperatively binding on the State courts as would be a decision of the Federal Supreme Court, but it is an appellate decision affirming a judgment of a Federal district court in harmony, as we think, with the general views expressed by the Federal court of last resort when construing the interstate commerce law as to the force and effect of an order bill of lading issued pursuant to it; and of this Federal law it is said:

"That the legislation supersedes all regulations and policies of a particular State upon the same subject results from its general character." *Adams Express Co.* v. *Croninger, supra.*

It was insisted by the defendants in each of the following cases that they were governed by the *Nelson Grain Co. Case: Turnbull* v. *Railroad Co.,* 183 Mich. 213; *Thomas* v. *Blair, supra; Churchill* v. *Railway Co.,* 188 Mich. 376; *Ortner* v. *Railroad Co.,* 202 Mich. 52.

While analogous in many respects, distinctions were pointed out in those cases which it was thought justified a contrary view. It is sufficient to say of them that in the results reached they are not out of line with the Federal authorities; and of the *Nelson Grain Co. Case,* that in view of the trend of Federal decisions upon the subject it can no longer be accepted as a binding precedent upon the question of liability for delivery without requiring surrender of the order bill of lading issued under the interstate commerce law.

We find no occasion to disturb the conclusion of the trial court that as the lawful holder of the order bill of lading plaintiff was entitled under the undisputed

facts to recover for the value of the wrongfully delivered shipment. That amount is not in dispute except as to the $137.50 with interest which he sent to the Thompson Company in rebate for the inferiority of the consignment. Defendant is in no way responsible for plaintiff's voluntary remittance to the Thompson Company of that amount.

In *Belden* v. *Railroad*, 88 Vt. 300 (92 Atl. 212), it is said:

"Though drafts attached to a bill of lading are for more than the value of the shipment, the actual value thereof, less unpaid freight thereon, is the measure of recovery for delivering it to the prospective purchaser without presentation of the bill of lading."

*Vide*, also, *Stearns* v. *Railway Co.*, 148 Mich. 271.

If plaintiff sees fit within twenty days to remit from the judgment $137.50 and interest thereon with costs which, undisturbed, the judgment would otherwise carry, the same will stand affirmed without costs to either party; otherwise the judgment is reversed with costs to defendant and a new trial granted.

MOORE, C. J., and BROOKE, FELLOWS, STONE, CLARK, BIRD, and SHARPE, JJ., concurred.