**Michigan Supreme Court**
**Lansing, Michigan 48909**

# Opinion

Chief Justice
Maura D. Corrigan

Justices
Michael F. Cavanagh
Elizabeth A. Weaver
Marilyn Kelly
Clifford W. Taylor
Robert P. Young, Jr.
Stephen J. Markman

**FILED MAY 15, 2001**

YELLOW FREIGHT SYSTEM, INC,

    Plaintiff-Appellee,

v                                    No. 113656

STATE OF MICHIGAN, MICHIGAN DEPARTMENT
OF TREASURY and ITS STATE TREASURER,
MICHIGAN DEPARTMENT OF COMMERCE and
ITS DIRECTOR, and MICHIGAN PUBLIC SERVICE
COMMISSION and ITS COMMISSIONERS,

    Defendants-Appellants.

BEFORE THE ENTIRE BENCH

WEAVER, C.J.

    This case presents an issue of statutory interpretation. Plaintiff, Yellow Freight System, Inc., alleges that defendants collected registration fees in excess of the amount allowed under the 1991 Intermodal Surface Transportation Efficiency Act (ISTEA), 49 USC 11506, which restricts a state's registration fees to an amount "equal to the fee . . . that such state collected or charged as of November 15, 1991," 49 USC 11506(c)(2)(B)(iv)(III). Specifically, plaintiff contends that in determining the amount of the fee charged or

1

collected on November 15, 1991, one must consider the effect that any then existing reciprocity agreements had on the fees.

We reject plaintiff's claims and hold that in determining the "fee . . . collected or charged" under 49 USC 11506(c)(2)(B)(iv)(III), Michigan's reciprocity agreements are irrelevant. We reverse the Court of Appeals decision affirming the Court of Claims order for summary disposition in favor of plaintiff and remand this case to the Court of Claims for further proceedings consistent with this opinion.

I

Congress has the power to "regulate Commerce . . . among the several States" and "[t]o make all Laws which shall be necessary and proper for carrying into Execution" that power to regulate commerce. US Const, art I, § 8. Under the Commerce Clause, states can impose significant regulatory burdens on interstate motor carriers only when authorized to do so by Congress. *Michigan Pub Utility Comm v Duke,* 266 US 570, 577; 45 S Ct 191; 69 L Ed 445 (1925). Over the years Congress has authorized the states to require registration of interstate motor carriers, subject to the supervision of the Interstate Commerce Commission. See Motor Carrier Act of 1935, PL 74-265, 49 USC 301 *et seq.* In 1991, Congress passed the ISTEA,[1] which directed the Interstate Commerce Commission (ICC) to restructure the then existing regulations governing vehicle registration and registration fees. 49 USC 11506. As a result, the ICC issued the "single state" registration

---

[1] Provisions similar to those in this section are now contained in 49 USC 14504.

2

system (SSRS) in 1993, 49 CFR 1023.[2]

A brief overview of the previous interstate motor carrier registration system is helpful in understanding the dispute now before this Court. Before 1991, states could require interstate motor carriers to annually register and pay fees on each vehicle that operated within its borders. Thirty-nine states, including Michigan, elected to participate in a "bingo card" system.[3] Under the "bingo card" system interstate motor carriers attached a "bingo card" to each of their motor vehicles. States through which the vehicle traveled then issued each vehicle a registration "stamp" which was placed in a designated area on the bingo card. Participating states were allowed to charge no more than $10 per stamp.

While operating under the prior "bingo card" registration system, some states entered into reciprocity agreements, under which a state would discount or waive the registration fee for carriers based in the other's state. The motor carrier's principal place of business was most commonly used as the basis for determining reciprocity. Michigan, however, initially based its reciprocity agreements on the state in which the vehicle was "base-plated," i.e. where it was

---

[2]This was redesignated in 1996 as 49 CFR 367.

[3]The "bingo card" system served three main purposes: (1) to make it easier to determine whether a specific vehicle had been registered by simply looking at the "bingo card," (2) to ensure compliance by interstate motor carriers to register all vehicles in operation, and (3) to prevent carriers from operating uninsured vehicles.

registered or license-plated.[4]

Seeking to "benefit the interstate carriers by eliminating unnecessary compliance burdens" and "to preserve revenues for the states which had participated in the bingo program," Congress replaced the old system by enacting the ISTEA.[5] The SSRS was intended to serve as the sole avenue for state registration of interstate carriers.[6] *Nat'l Ass'n of Regulatory Utility Comm'rs v Interstate Commerce Comm 309 US App DC 325;* 41 F3d 721 (1994). Under the SSRS a motor carrier registers annually with only one state. This "registration state" is responsible for collecting the per-vehicle fees and distributing them to any participating states through which the carrier runs its motor vehicles. 49 USC 11506(c)(2)(A)(iii).

The section of the ISTEA at issue in the present case is subsection 11506(c)(2)(B)(iv). It provides that each state "shall establish a fee system" that "result[s] in a fee for each participating state that is equal to the fee, not to exceed $10 per vehicle, that such State collected or charged as of November 15, 1991 . . . ."

In 1991, before the implementation of the SSRS, the

---

[4]In other words, Michigan would waive its registration fee for vehicles base-plated in a state that waived its fee for vehicles that were base-plated in Michigan.

[5]H R Conf Rep No 102-404, 102nd Cong, 1st Sess 437 (1991), reprinted in 1991 U S Code Cong & Admin News, 1526, 1679, 1817.

[6]Participation in the SSRS was limited to the thirty-nine states that had elected to participate in the "bingo card" program. 49 USC 11506(c)(2)(D)

Michigan Public Service Commission (MPSC) altered its reciprocity agreements. The MPSC adopted the more common "place of business" method of determining reciprocity, instead of the "base-plated" system that the MPSC had been using. This change was scheduled to become effective in February 1992. The MPSC mailed renewal applications reflecting this change to all interstate motor carriers, including the plaintiff, in September 1991. Plaintiff paid its 1992 fees[7] in September of 1991, under protest. Subsequently, plaintiff instituted this litigation.

Plaintiff contended that Michigan could not alter its reciprocity agreements, arguing that under the federal statute those agreements were frozen at their November 15, 1991, levels. Ruling on cross motion, the Court of Claims agreed with plaintiff and granted its motion, in part, for summary disposition.[8] In a two-to-one decision, the Court of Appeals affirmed the Court of Claims ruling. 231 Mich App 194; 585 NW2d 762 (1998). This Court granted leave to appeal, 461 Mich 1009 (2000).

---

[7]At that time plaintiff's principal place of business was in Kansas, and it had 3,730 vehicles base-plated in Illinois and Indiana. Under Michigan's old reciprocity agreements, Michigan's fees for those 3,730 vehicles base-plated in Illinois and Indiana would have been waived. However, after Michigan changed its method for determining reciprocity to one based on a company's principal place of business, Plaintiff was required to pay a $10 vehicle registration fee for each of the 3,730 vehicles. Thus, rather than paying nothing under the old reciprocity method, plaintiff was required to pay $37,300 annually under Michigan's new system.

[8] Plaintiff's complaint also sought attorney fees under 42 USC 1988. The Court of Claims did not grant this relief, and plaintiff has not appealed that decision to this Court.

5

There is no dispute that 49 USC 11506(c)(2)(B)(iv)(III) froze the registration fees that a state can charge as of November 15, 1991. The parties dispute the proper interpretation of a key phrase in that section of the ISTEA: "equal to the fee, not to exceed $10 per vehicle, that such State collected or charged as of November 15, 1991." The fundamental question before us is whether Michigan's reciprocity agreements should be considered in determining what fees were charged or collected as of November 15, 1991. We conclude that under the plain language of the statute, reciprocity agreements are not relevant in making that determination.

## A

This is an issue of first impression for this Court; nor have any other state courts addressed it. The only court that has considered it is the District of Columbia Circuit Court of Appeals, *Nat'l Ass'n of Regulatory Utility Comm'rs, supra.* That court followed the ICC's decision[9] to ban states from

---

[9]The ICC has taken varying positions on this issue. In its Advance Notice of Proposed Rulemaking, 57 Fed Reg 20,072 (1992), and its Notice of Proposed Rulemaking, 58 Fed Reg 5951 (1993), the ICC found that the reciprocity agreements were made voluntarily, and that there was no good reason for the ICC's involvement in them. The ICC had noted that "it might place a heavy administrative burden on a registration State were we to require that it collect from different carriers different fees from the same State depending on the various reciprocal agreements negotiated by the various states in which each carrier operates." 9 ICC2d 610, 617 (1993).

However, the ICC subsequently reversed its position, and now says "we have concluded that participating States must consider fees charged or collected under reciprocity agreements when determining the fees charged or collected as

6

charging registration fees in excess of preexisting reciprocal

discounts, saying:

> [W]e think the Commission was correct in concluding that the plain language of the statute precludes petitioners' interpretation. It does not matter whether Congress actually focused on the reciprocal discount practice or even was aware of it. Nor is it of any significance that the Commission initially misread the statute; that is what comment periods are for. *Id., at 729.*

We are not bound to follow that decision,[10] and, for the

reasons given below, we do not agree with the federal court's

decision to defer to the ICC's interpretation of the ISTEA.

B

Plaintiff contends that in interpreting the ISTEA we must

give deference to the ICC's interpretation. Because the issue

is the interpretation of a federal statute and the deference

due a federal agency's construction of that statute, we will

apply the rules of construction set out by the federal

judiciary.[11]  The seminal case is *Chevron, USA, Inc v Natural*

---

of Nov 15, 1991, as required by § 11506(c)(2)(B)(iv)." Single State Insurance Registration Exparte No MC-100 (Sub-No 6), 9 ICC2d 610, 618-619 (1993).

[10] Michigan adheres to the rule that a state court is bound by the authoritative holdings of federal courts upon federal questions, including interpretations of federal statutes. See *Bement v Grand Rapids & Indiana R Co,* 194 Mich 64; 160 NW 424 (1916), and *In re Hopps Estate,* 324 Mich 256; 36 NW2d 908 (1949). However, where there is no United States Supreme Court decision upon the interpretation in question, the lower federal courts' decisions, while entitled to respectful consideration, are not binding upon this Court. See *Winger v Grand Trunk W R Co,* 210 Mich 100, 117; 177 NW 273 (1920), *Schueler v Weintrob,* 360 Mich 621; 105 NW2d 42 (1960), and 21 CJS, Courts, § 159, pp 195-197.

[11] This Court has not previously determined what deference the courts of this state owe to a federal agency's interpretation of a federal statute.  However, in that

7

*Resources Defense Council, Inc*, 467 US 837; 104 S Ct 2778; 81 L Ed 2d 694 (1984). There the United States Supreme Court established that a court must first determine whether the statute's meaning is clear; if so, then the court must apply the statute as written. If the statute is ambiguous, then the court must give deference to the agency's interpretation.

> When a court reviews an agency's construction of the statute which it administers, it is confronted with two questions. First, always, is the question whether Congress has directly spoken to the precise question at issue. If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress. If, however, the court determines Congress has not directly addressed the precise question at issue, the court does not simply impose its own construction on the statute, as would be necessary in the absence of an administrative interpretation. Rather, if the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute. *Id. at 842-843.*

Here we find that the plain meaning of the terms of the ISTEA is clear, and we apply the statute as written. Because we find that the statute is not ambiguous[12], we need not proceed

_____

circumstance the Court of Appeals has applied the federal standards of deference as set out in *Chevron, supra* 2778. See *Walker v Johnson & Johnson Vision Products, Inc,* 217 Mich App 705, 713; 552 NW2d 679 (1996), *Gibbs v General Motors Corp,* 134 Mich App 429, 432; 351 NW2d 315 (1984), and 231 Mich App 200. This is also the approach taken by several other state courts. See for example: *Totemoff v State,* 905 P2d 954, 967 (Alas, 1995), *Delorme v North Dakota Dep't of Human Services,* 492 NW2d 585, 587, n 2 (ND, 1992), *Rodriguez v Perales*, 86 NY2d 361, 367; 657 NE2d 247; 633 NYS2d 252 (1995), and *Bell Atlantic Mobile, Inc v Dep't of Public Utility Control,* 253 Conn 453, 470; 754 A2d 128 (2000).

[12] The dissent contends that the statute is ambiguous, asserting that this is demonstrated by "the several interpretations of its wording advanced by the parties." If

8

to the second step of *Chevron, supra*, and we do not reach the agency's interpretation.

C

The question before us is whether any then-existing reciprocity agreements should be considered when determining what fee the state charged or collected as of November 15, 1991. The ISTEA itself refers only to the fee collected or charged, and contains no reference to reciprocity agreements. 49 USC 11504(c)(2)(B)(iv)(III) directs the ICC to "establish a fee system" that " result[s] in a fee for each participating State that is equal to the fee, not to exceed $10 per vehicle, that such State collected or charged as of November 15, 1991." The new "fee system" is based not on the fees collected from one individual company, but on the fee system that the state had in place on November 15, 1991. We must look not at the fees paid by plaintiff in any given year, but at the generic fee Michigan charged or collected from carriers as of November 15, 1991.

To determine what registration fee Michigan charged on November 15, 1991, we examine MCL 478.7(4); MSA 22.565(1)(4) in the Motor Carrier Act. Since 1989 that statute has provided for a fee of $10 to be charged for those motor carrier vehicles operating in Michigan and licensed in another state or province of Canada:

> The annual fee levied on each interstate or

---

the parties' conflicting interpretations were the measure of a statute's ambiguity, then almost every statute litigated would be deemed ambiguous. A statute is not ambiguous because it requires careful attention and analysis.

9

> foreign motor carrier vehicle operated in this state and licensed in another state or province of Canada shall be $10.00.

The same statute, MCL 478.7(4); MSA 22.565(1)(4), also gives the commission the ability to waive the $10 fee under certain circumstances:

> The commission may enter into a reciprocal agreement with a state or province of Canada that does not charge vehicles licensed in this state economic regulatory fees or taxes and may waive the fee required under this subsection.

Thus, under MCL 478.7(4); MSA 22.565(1)(4), the fee charged as of November 15, 1991, was $10. While that fee may be waived, and thus not "charged or collected," *for a particular carrier* under a reciprocity agreement, such voluntary agreements to waive the fee that happen to benefit a particular carrier do not affect the *generic* per vehicle fee in place on November 15, 1991. As stated, the clear focus of 49 USC 11506(c)(2)(B)(iv)(III) is on the generic "fee" that Michigan charged or collected as of November 15, 1991, and not on whether that fee was charged to or collected from a particular carrier.

The ICC's position that "participating States must consider fees charged or collected under reciprocity agreements when determining the fees charged or collected as of Nov 15, 1991, as required by § 11506(c)(2)(B)(iv),"[13] added a concept not within the express language of the statute. It added consideration of voluntary agreements between the states to waive or reduce the fees imposed. It is not for the ICC,

---

[13]Single State Insurance Registration Exparte No MC-100 (Sub-No 6) 9 ICC2d 610 (1993)

10

or this Court, to insert words into the statute.

IV

We hold that Michigan's reciprocity agreements are not relevant in determining what fee was "charged or collected" as of November 15, 1991. The lower courts erred in granting summary disposition for plaintiffs. We reverse the Court of Appeals decision, and remand this case to the Court of Claims for further proceedings consistent with this opinion.

CORRIGAN, C.J., and TAYLOR, YOUNG, and MARKMAN, JJ., concurred with WEAVER, J.

STATE OF MICHIGAN

SUPREME COURT

YELLOW FREIGHT SYSTEM, INC.,

    Plaintiff-Appellee,

v                                      No. 113656

STATE OF MICHIGAN, MICHIGAN
DEPARTMENT OF TREASURY and ITS
STATE TREASURER, MICHIGAN
DEPARTMENT OF COMMERCE and ITS
DIRECTOR, and MICHIGAN PUBLIC
SERVICE COMMISSION and ITS
COMMISSIONERS,

    Defendants-Appellants.

_____

KELLY, J. (*dissenting*).

    I disagree with the majority's conclusion that reciprocity agreements are not relevant in determining the registration fees that Michigan charged under the 1991 Intermodel Surface Transportation Efficiency Act (ISTEA), 49 USC 11506.[1] One such agreement waived registration fees for vehicles licensed in Illinois, including plaintiff's vehicles, so that no fee was collected or charged within the meaning of the statute. Consequently, I would affirm the decisions of the Court of Appeals and the Court of Claims.

_____

    [1]The ISTEA now appears at 49 USC 14504.

The ISTEA replaced the bingo card system of registering interstate motor carriers with a single state registration system. *Nat'l Ass'n of Regulatory Utility Comm'rs v Interstate Commerce Comm*, 309 US App DC 325, 328; 41 F3d 721 (1994). Under the ISTEA system, a state can charge a fee "that is equal to the fee, not to exceed $10 per vehicle, that such State collected or charged as of November 15, 1991." 49 USC 11506(c)(2)(B)(iv)(III). The question in this case is what effect reciprocity agreements have on determining the fee that Michigan can charge under the single state registration system.

As an initial point, I disagree with the majority's conclusion that the meaning of the language in the statute is plain, reasonably susceptible of only one interpretation. Rather, I find it ambiguous. A statute is ambiguous when reasonable minds could differ as to its meaning. *In re MCI Telecommunications Complaint,* 460 Mich 396, 411; 596 NW2d 164 (1999). That the ISTEA is ambiguous as regards the reciprocity agreements is demonstrated by the several interpretations of its wording advanced by the parties and by justices on this Court. The language of the statute supports both positions, allowing for opposing and similarly plausible constructions. Despite careful attention and analysis, reasonable minds can and do differ with respect to the statute's meaning concerning reciprocity agreements.

Alternatively, if the statute's language were plain, the meaning of the words "collected or charged" must lead to a result opposite that reached by the majority. The majority

2

concludes that Michigan was entitled to charge plaintiff a registration fee, but the majority's interpretation of the ISTEA depends on addition to the statute of words not present there. Whether the state of Michigan could have collected or charged a "generic" per vehicle fee is not pertinent. The statute specifies "fees . . . collected or charged as of November 15, 1991." It does not say "fees that the state could have collected or charged."

While the ISTEA does not expressly make reference to reciprocity agreements, the fee system in place on November 15, 1991, does. MCL 478.7(4); MSA 22.565(1)(4) provides:

> The annual fee levied on each interstate or foreign motor carrier vehicle operated in this state and licensed in another state or province of Canada shall be $10.00. The commission may enter into a reciprocal agreement with a state or province of Canada that does not charge vehicles licensed in this state economic regulatory fees or taxes and may waive the fee required under this subsection.

A plain reading of this provision leads to the conclusion that reciprocity agreements are an inherent part of the state's registration fee system. The generic fee levied under the statute is not absolute, but subject to reciprocity agreements that waive the fee. Thus, the fee charged as of November 15, 1991, was $10.00, unless a reciprocity agreement pertained. Voluntary agreements to waive the fee are relevant in determining the per vehicle fee system in place on November 15, 1991, as well as the fee collected or charged pursuant to that system.

The parties do not dispute that Michigan had a reciprocity agreement with Illinois that, by its terms, waived

3

Michigan registration fees for interstate motor carriers licensed in Illinois. Pursuant to the agreement, the state did not charge registration fees for plaintiff's vehicles in 1990 and in 1991. It was not until Michigan revised its reciprocity system in 1991 that it charged plaintiff a registration fee.

This change in the reciprocity system did not become effective until the 1992 registration year. Plaintiff was not charged a registration fee in Michigan, nor was one collected from it in Michigan for the 1991 registration year. The fact that the state had a right to or could have charged a "generic" registration fee does not change the fact: it did not charge plaintiff a fee until the 1992 registration year.

The majority's characterization of the language of the statute as "plain" is belied by the fact that the majority is obliged to construe the phrase "collected or charged" to reach its result. Only a strained reading of "collected or charged" leads to the conclusion that the state charged a fee when it did not do so. That the statute does not expressly mention reciprocity agreements does not change the fact that reciprocity agreements were an inherent part of the fee system in place on November 15, 1991. In this case, the reciprocity agreement with Illinois in effect during the 1991 registration year caused Michigan to waive the fees it might have imposed under MCL 478.7; MSA 22.565(1). As a consequence, no fees had been "collected or charged as of November 15, 1991."

The Court should give deference, as did the District of

Columbia Circuit Court of Appeals,[2] to the Interstate Commerce Commission's construction of the language in question, because it is based on a permissible construction of the ISTEA. *Chevron, USA, Inc v Natural Resources Defense Council, Inc*, 467 US 837, 842-844; 104 S Ct 2778; 81 L Ed 2d 694 (1984).  It should affirm the decisions of the Court of Appeals and the Court of Claims in favor of plaintiff.

---

[2]*Nat'l Ass'n of Regulatory Utility Comm'rs, supra.*

# S T A T E   O F   M I C H I G A N

## SUPREME COURT

YELLOW FREIGHT SYSTEM, INC,

    Plaintiff-Appellee,

v

                                 No. 113656

STATE OF MICHIGAN, DEPARTMENT OF
TREASURY, STATE TREASURER,
DEPARTMENT OF COMMERCE, DIRECTOR
OF DEPARTMENT OF COMMERCE,
MICHIGAN PUBLIC SERVICE
COMMISSION and MICHIGAN PUBLIC
SERVICE COMMISSIONERS,

    Defendants-Appellants.

_____

CAVANAGH, J. (*dissenting*).

I disagree with the majority's conclusion that the relevant provision of the federal Intermodal Surface Transportation Efficiency Act (ISTEA), 49 USC 11506(c)(2)(B)(iv)(III), is unambiguous and that this Court is free to decide that the section does not take into account reciprocity agreements. Rather, I conclude that this provision is ambiguous, and that the Interstate Commerce Commission (ICC) has permissibly construed it to take into account reciprocity agreements. Under *Chevron, USA, Inc v Natural Resources Defense Council, Inc,* 467 US 837; 104 S Ct 2778; 81 L Ed 2d 694 (1984), then, this Court should defer to

the ICC's interpretation of that provision.  I, therefore, would affirm the judgment of the Court of Appeals, and must respectfully dissent.

In this case, the Court is called on to review a federal statute that was administered by the ICC when this case arose.[1]  As the majority points out, under the Supreme Court's decision in *Chevron,* when a court reviews an agency's construction of a statute the agency administers, the court faces a two-part inquiry.  First, the court must determine whether the statute clearly and unambiguously expresses the legislative intent.  If so, it then must give effect to the statute as written.  However, if the statute is not clear and unambiguous, the court "does not simply impose its own construction on the statute," but instead reviews whether the agency has permissibly construed the statute.  If it has, the court should defer to the agency's construction.  *Chevron* at 842-843.  As alluded, the ICC, in *Single State Insurance Registration,* 9 ICC2d 610, 618-619 (1993), construed the statute in question to take into account reciprocity agreements that exempted some interstate carriers from state fees, a conclusion opposite to that reached by the majority.

To determine whether a statute clearly and unambiguously expresses legislative intent, courts begin with the statutory language.  If the words of a statute are clear and unambiguous, the court must apply them as written, and no

---

[1] The ICC was abolished in 1996, and the references to the ICC in the governing statute, which was recodified, were changed to refer to the Secretary of Transportation.  See 49 USC 14505; see also PL 104-88, 109 Stat 803, tit I, § 103.

further judicial construction is required or permitted. See, e.g., *Tryc v Michigan Veterans' Facility,* 451 Mich 129, 135; 545 NW2d 642 (1996). However, when there can be reasonable disagreement over a statute's meaning, see *People v Adair,* 452 Mich 473, 479; 550 NW2d 505 (1996), or, as others have put it, when a statute is capable of being understood by reasonably well-informed persons in two or more different senses, that statute is ambiguous. See 2A Singer, Statutes & Statutory Construction (6th ed), § 45.02, pp 11-12. For example, this Court has concluded that statutes have been ambiguous when one word in the statute has an unclear meaning, see *Perez v Keeler Brass Co,* 461 Mich 602, 610; 608 NW2d 45 (2000), when a statute's interaction with another statute has rendered its meaning unclear, see *People v Denio,* 454 Mich 691, 699; 564 NW2d 13 (1997), or when application of the statute to facts has rendered the correct application of the statute uncertain, see *Elias Bros v Treasury Dep't,* 452 Mich 144, 150; 549 NW2d 837 (1996).

In this case, the majority concludes that the governing ISTEA provision is plain and unambiguous. In the words of our prior decisions, then, the majority concludes that there cannot be reasonable disagreement over the statute's meaning, and that reasonably well-informed people cannot understand the statute in two or more different senses. Before amendment, the governing section provided that the ICC, and through it, states

> shall establish a fee system for the filing of proof of insurance as provided under subparagraph (A)(ii) of this paragraph that (I) will be based on the number of commercial motor vehicles the carrier

3

> operates in a State and on the number of States in which the carrier operates, (II) will minimize the costs of complying with the registration system, and (III) will result in a fee for each participating State that is equal to the fee, not to exceed $10 per vehicle, that such State collected or charged as of November 15, 1991 . . . . [49 USC 11506(c)(2)(B)(iv).]

I cannot agree that the meaning of this language is clear and unambiguous. Rather, it is subject to reasonable disagreement.

The majority concludes that the fee "collected or charged" refers only to the fee system a state had in place on November 15, 1991, and that this is clear from the plain meaning of § 11506(c)(2)(B)(IV). See slip op at 11-12. However, the conclusion that the fee "collected or charged" refers only to the fee system requires that "collected or charged" include the possibility that the fee "charged" can be simultaneously "waived." *Id.* at 12. Otherwise, there would be no question that the state had not collected or charged anything from plaintiff until the changes in the reciprocity system became effective in 1992, after the cutoff date provided in § 11506. The conclusion that a fee can be "charged," yet concurrently "waived," though, is not consistent with this Court's approach to plain language.

When construing a statute according to its plain language, unless the statute itself dictates otherwise, this Court generally turns to dictionary definitions of the statutory terms to find those terms' ordinary and generally accepted meanings. See, e.g., *Denio* at 699. Applying this approach to the instant case calls the majority's conclusion that a fee can be simultaneously "charged" and waived into

4

question. "Charge" is defined variably as (1) "To hold financially liable; demand payment from," (2) "To demand or ask payment," (3) "A financial burden, as a tax or lien," (4) "To set or ask (a given amount) as a price," (5) "Expense; cost," or (6) "The price set or asked for something." *The American Heritage Dictionary* (2d College ed, 1982).

The problem in this case is that the ordinary and generally accepted meanings of the term "charge" do not dictate the majority's conclusion. Rather, the definitions of "charge" present a spectrum of concepts ranging from those that might encompass the majority understanding that a fee can be "charged" but concurrently "waived"—definitions 4, 6, and arguably 5—to those that do not encompass that understanding because they require that the charge be a "demand" or a "burden." Definitions 1, 2, and 3 do not support the majority's conclusion because, under those meanings of "charge," the state would have to waive a fee, yet also hold a carrier financially liable for it, or demand or ask for payment of a fee that had been waived. Similarly, if a fee has been "waived," it is not a financial burden on the party responsible for the fee. In this case, plaintiff was not made financially liable for, or financially burdened with, the waived fee, and the state did not demand the waived fee before November 15, 1991. Thus, although several accepted definitions of "charge" support the majority conclusion, several others weigh against it.

As mentioned above, the meaning of a facially unambiguous term can be ambiguous in certain circumstances. See *Denio* at

699; *Perez* at 610. Thus, although "charged" may not at first blush appear ambiguous, in the context of a fee that was established in a fee system, but never demanded because of a reciprocity agreement, "charged" is ambiguous because the fee may or may not fit the definition of a fee that is "charged." If the statutory term "charged" is narrow and requires a demand for payment, the state had not charged plaintiff the fees before November 15, 1991, and cannot charge plaintiff for later years. On the other hand, if "charged" is broad and requires only the setting of a fee, the state had charged the fee by the cutoff date, and plaintiff cannot avoid payment. Compare *Perez* at 610 ("refuses" could have a broad or narrow meaning).

Although it does so without explanation, the majority chooses the latter meaning, concluding that even when the fee was waived for particular carriers, it still had been charged in general. Slip op at 12. I do not contend that the majority has chosen the wrong definition of "charge," or that its conclusion about § 11506's meaning is unreasonable. However, for the majority to come to its conclusion, it had to resolve the ambiguity surrounding the meaning of the statutory term "charged," specifically, whether "charged" was used in its broad or narrow sense.[2] Normally, this Court has a duty

---

[2] To conclude that the fee "charged" refers only to the fee set by the fee system, the majority must nevertheless conclude that "charged" is broad, meaning only that the state "set a price" for carriers but did not hold a carrier liable for that price. Such an understanding comports only with definitions 4 and 6 above, but not the narrower meaning of "charge" in definitions 1, 2, and 3. Otherwise, the fee "charged" could refer to only a particular fee and not the
(continued...)

to make such a decision.  In this case, however, the different possible meanings of "charged" present an ambiguity in § 11506.  Under *Chevron,* rather than this Court imposing its own construction on the statute, we must consider whether the ICC, the agency responsible for administering this statute and which has already resolved this ambiguity in § 11506, did so permissibly.

I conclude that the ICC did permissibly construe the statute, and, therefore, I would defer to that agency.  In *Single State,* the ICC considered whether the freeze on registration fees enacted through the ISTEA should take reciprocity agreements into account.  It decided that the ISTEA does take reciprocity agreements into account when freezing the fees that states "charged."  Thus, an interstate carrier that was not charged any fees before November 15, 1991, because it was operating under a reciprocity agreement, could not be charged fees after that time.  See *Single State, supra* at 617-619.  This interpretation evidences that the ICC preferred the narrow approach to "charged," concluding that an

---

[2](...continued)
system itself.

Further, if the majority is correct that the fee charged refers only to the fee system in place, but not the fees charged of particular carriers, then apparently Michigan could waive fees for every carrier operating in the state, under reciprocity agreements or not, but nevertheless continue to be said to "charge" a generic fee.  In such a scenario, the majority would apparently conclude that Michigan "charged" a fee even though it held no carrier financially liable for any fee.

Again, there is room for reasonable disagreement over the proper understanding of these statutory terms.  That room for disagreement, though, indicates that we should defer to the ICC understanding.

interstate carrier had not been "charged" a registration fee unless a state had made a demand for the fee, or unless the carrier had been held financially liable for the fee. Under reciprocity agreements, states did not make demands for fees, and did not hold carriers liable for fees. Hence, carriers operating under those agreements were not "charged" before the cutoff date, and could not be charged after it. Though this Court may not prefer the ICC's interpretation of § 11506 or the narrow approach to the term "charged," in light of the different possible meanings of the statute, the ICC approach is certainly a permissible construction. I would, therefore, defer to that agency's interpretation of this section.

In sum, I disagree with the majority's conclusion that 49 USC 11506 is not reasonably subject to different understandings. Whether the statutory term "charged" is understood narrowly or broadly affects this statute's meaning. Because the statute can be understood differently, this Court's only role is to consider whether the federal agency responsible for administering this statute, which has already considered the question before this Court, permissibly answered that question. The ICC took a narrow view of the meaning of "charged," but nevertheless a view that is supported by § 11506. I would defer to that agency's view and, therefore, must respectfully dissent.