41 F.3d 721
 Fed. Carr. Cas. P 83,944, 309 U.S.App.D.C. 325
 NATIONAL ASSOCIATION OF REGULATORY UTILITY COMMISSIONERS,
Illinois Commerce Commission, Kansas Corporation Commission,
Oklahoma Corporation Commission, State of Rhode Island &
Providence Plantations Division of Public Utilities &
Carriers, Public Service Commission of South Carolina,
Montana Public Service Commission, and Arkansas State
Highway Commission, Petitioners,
v.
INTERSTATE COMMERCE COMMISSION and United States of America,
Respondents,
American Trucking Association, American Movers Conference,
Interstate Truckload Carriers Conference, Alabama Public
Service Commission, Oregon Public Utility Commission,
Louisiana Public Service Commission, Mississippi Public
Service Commission, Public Utilities Commission of Ohio,
Nebraska Public Service Commission, American Bus
Association, Railroad Commission of Texas, Public Utilities
Commission of the State of California, American Insurance
Association, National Association of Independent Insurers,
Colorado Public Utilities Commission, and Tennessee Public
Service Commission, Intervenors.
AMERICAN INSURANCE ASSOCIATION, and National Association of
Independent Insurers, Petitioners,
v.
INTERSTATE COMMERCE COMMISSION, and United States of
America, Respondents,
National Association of Regulatory Utility Commissioners,
American Trucking Association, American Movers Conference,
Interstate Truckload Carriers Conference, and Oregon Public
Utility Commission, Intervenors.
 Nos. 93-1362, 93-1450.
 United States Court of Appeals,
District of Columbia Circuit.
 Argued Sept. 20, 1994.
Decided Dec. 2, 1994.
 
 C.A.D.C. 1994.
 Party who seeks to challenge aspect of agency action not questioned by any other petitioner must file separate petition for review.
 Petition for Review of Orders of the Interstate Commerce Commission.
 Charles D. Gray argued the cause for petitioners Nat. Ass'n of Regulatory Utility Com'rs, et al. With him on the briefs were Robert L. Wilson, Martin Jacobson, Paul Rodgers, F. David Butler, and Christine A.G. Southgate. Brian J. Moline entered an appearance for petitioner Kansas Corp. Com'n. Leslie W. Pepper entered an appearance for petitioner Oklahoma Corp. Com'n.
 Eugene Scalia argued the cause for petitioners American Ins. Ass'n and Nat. Ass'n of Independent Insurers. With him on the briefs were David Snyder, William J. Kilberg, and Theodore J. Boutrous.
 Michael L. Martin, Attorney, Interstate Commerce Com'n, argued the cause for respondents. With him on the briefs were Henri F. Rush, General Counsel, and Craig M. Keats, Associate General Counsel, Interstate Commerce Com'n, and Anne K. Bingaman, Asst. Atty. Gen., Robert B. Nicholson, and John P. Fonte, Attorneys, U.S. Dept. of Justice.
 Keith L. Kutler argued the cause for intervenors Oregon Public Utility Com'n, et al. With him on the briefs were Ida M. Passamonti and John A. Garner. Kenneth E. Siegel entered an appearance for intervenor American Trucking Ass'n, et al. Brian A. Eddington entered an appearance for intervenor Louisiana Public Service Com'n. William B. McKinley entered an appearance for intervenor Mississippi Public Service Com'n. James B. Gainer entered an appearance for intervenor Public Utilities Com'n of Ohio. L. Steven Grasz entered an appearance for intervenor Nebraska Public Service Com'n. Charles A. Webb entered an appearance for intervenor American Bus Ass'n. Elizabeth R.B. Sterling entered an appearance for intervenor R.R. Com'n of Texas. Neil L. Tillquist entered an appearance for intervenor Colorado Public Utilities Com'n. Henry M. Walker entered an appearance for intervenor Tennessee Public Service Com'n.
 Before: SILBERMAN, BUCKLEY, and ROGERS, Circuit Judges.
 Opinion for the Court filed by Circuit Judge SILBERMAN.
 SILBERMAN, Circuit Judge:
 
 
 1
 In these consolidated cases, petitioners seek review of several aspects of the Interstate Commerce Commission's "single-state registration" regulations, which modify the system under which interstate motor carriers register with the states through which they operate their vehicles. We vacate and remand that part of the ICC's regulations which authorizes motor carriers, rather than the states, to copy the official state-issued receipt that is required by federal law to be carried in each vehicle. We affirm, however, the ICC's determination to ban states from charging registration fees under the single-state system in excess of preexisting reciprocal discounts, and we dismiss intervenors' challenge to the ICC's prohibition on independent state insurance filing requirements as not properly before the court.
 
 I.
 
 2
 State regulation of interstate motor carriers exists as a matter of congressional grace. Early in this century, the Supreme Court held that independent state attempts to impose significant regulatory burdens on interstate motor carriers are inconsistent with the Commerce Clause unless authorized by Congress. See, e.g., Michigan Pub. Util. Comm'n v. Duke, 266 U.S. 570, 577, 45 S.Ct. 191, 193, 69 L.Ed. 445 (1925). With the passage of the Motor Carrier Act of 1935, Pub.L. No. 74-255, 49 Stat. 543, 49 U.S.C. Secs. 301 et seq. (1940), Congress provided for limited state regulation of interstate commercial transportation and, through successive statutory amendments, eventually authorized the states to require registration by interstate motor carriers, subject to the supervision of the Interstate Commerce Commission, see 49 U.S.C. Sec. 11506 (1988) (superseded). Recently, in 1991, Congress passed the Intermodal Surface Transportation Efficiency Act (ISTEA), Pub.L. No. 102-240, 105 Stat. 1914, which addressed numerous aspects of national transportation funding and regulation. The Act directed the ICC to reform the then-existing federal regulations governing state licensing and registration procedures for interstate motor carriers. See id. Sec. 4005, 105 Stat. 2146-48, 49 U.S.C. Sec. 11506 (1993). The Commission, after informal notice and comment procedures, issued final regulations implementing a "single-state" registration system. Single-State Insurance Registration, 9 I.C.C.2d 610 (1993).
 
 
 3
 A full understanding of the disputes over the current regulations requires some familiarity with the former state-registration system which they replace, the broad outlines of which were authorized by Congress in 1965. See Pub.L. No. 89-170, 79 Stat. 648, eventually codified at 49 U.S.C. Sec. 11506 (1988) (superseded). Under the prior regime, states could require interstate motor carriers to register annually, for a fee assessed on a per-vehicle basis, and such impositions were not deemed unconstitutional burdens on interstate commerce provided that the state requirements were consistent with uniform provisions set forth in ICC regulations. See 49 C.F.R. Pt. 1023 (1992) (superseded). As proof of annual "registration," each state that chose to participate in the program issued a stamp for each vehicle, and these stamps were placed in the appropriate state spot on vehicle-specific "bingo cards." Id. Secs. 1023.31-32. Carriers, to get the cards, applied to the National Association of Regulatory Utilities Commissioners (NARUC), an interstate umbrella organization that, as envisioned by Congress, played a role in drafting the regulations that the ICC issued to create the "bingo card" system. 49 U.S.C. Sec. 11506(c)(1) (1988) (superseded).
 
 
 4
 States were allowed to charge up to $10 for each stamp issued (i.e., for each vehicle registered). 49 C.F.R. Sec. 1023.33 (1992) (superseded). Some states charged less, and some entered into reciprocal arrangements under which they would discount the listed fee for carriers based in each other's state. As of 1991, 39 states participated in the "bingo card" program, taking in approximately $50 million in aggregate revenues per year. H.R.CONF.REP. No. 102-404, 102d Cong., 1st Sess. 437 (1991), reprinted in 1991 U.S.CODE CONG. & ADMIN.NEWS, 1526, 1679, 1817. Non-participating states, although prohibited from demanding registration fees (because they did not issue the "bingo stamps" that were the statutory basis for state filing charges), were nonetheless permitted to request insurance filings, such as proof that a carrier was covered by an insurer authorized to do business in the state.
 
 
 5
 Under the "bingo card" regime, officers of participating states were able to determine whether a specific vehicle had been registered (and paid for) simply by requiring the driver to produce his vehicle's "bingo card" at a roadside stop or weigh station and checking whether it had a "bingo stamp" from the state. In this manner, the "bingo card" program helped to ensure that a carrier could not get away with registering (and paying for) only 10 vehicles while in fact operating 20. This system incidentally aided insurers as well. By constraining carriers from operating unregistered vehicles, the "bingo card" system made it more difficult for carriers to operate uninsured vehicles.
 
 
 6
 This was the system that Congress wished to dismantle and replace. The legislative history makes clear that the ISTEA amendments to Sec. 11506 reflected a compromise between the House and Senate. Initially, only the House bill contained a provision for replacing the "bingo card" program with a system less burdensome for truckers. It would have accomplished this by simply eliminating state registration and the accompanying fees, and provided for a one-time $50 million grant to "bingo" program states to offset unexpected revenue losses during the first year. The Senate bill, by contrast, did not deal with the subject at all. The ISTEA amendments before us emerged from conference, and reflect somewhat inconsistent purposes, seeking both "to benefit the interstate carriers by eliminating unnecessary compliance burdens" and "to preserve revenues for the states which had participated in the bingo program." H.R.CONF.REP. No. 102-404, 102d Cong., 1st Sess. 437 (1991), reprinted in 1991 U.S.CODE CONG. & ADMIN.NEWS, 1526, 1679, 1817. To further these ends, Congress directed the ICC to implement a "single-state" registration system, which was intended to be the sole constitutional avenue for state registration of interstate carriers. The statute provides that "[t]he requirement of a State that a motor carrier ... register the certificate or permit issued to the carrier" by the ICC "is not an unreasonable burden on transportation ... when the registration is completed under standards of the Commission under subsection (c) of this section." 49 U.S.C. Sec. 11506(b).
 
 
 7
 Subsection (c) sets forth the general outlines of the single-state registration scheme envisioned by Congress. The provision states that the ICC "shall implement a system under which--"
 
 
 8
 (A) a motor carrier is required to register annually with only one State;
 
 
 9
 (B) the State of registration shall fully comply with standards prescribed under this section; and
 
 
 10
 (C) such single State registration shall be deemed to satisfy the registration requirements of all other States.
 
 
 11
 Id. Sec. 11506(c)(1). The "registration state" may require applicants to submit evidence that they have been certified by the ICC, that they are properly insured, and that they have a local agent available for service of process. Id. Sec. 11506(c)(2)(A)(i), (ii), & (iv). The registration state also collects and distributes per-vehicle fees for those other states participating in the "single-state" system through which the carrier seeks to run its vehicles. Id. Sec. 11506(c)(2)(A)(iii). Participation is limited under the statute to the 39 states that had earlier elected to join the "bingo stamp" program. Id. Sec. 11506(c)(2)(D). Each of these states may charge carriers an amount "equal to the fee, not to exceed $10 per vehicle, that such State collected or charged as of November 15, 1991," id. Sec. 11506(c)(2)(B)(iv), and the registration state must "issue a receipt ... reflecting that the carrier has filed proof of insurance ... and has paid fee amounts in accordance with the fee system established," id. Sec. 11506(c)(2)(B)(i). Congress further provided "that copies of the receipt ... be kept in each of the carrier's commercial motor vehicles." Id. Sec. 11506(c)(2)(B)(ii). The statute does not specify which party--the registration state or the carrier itself--is to furnish the required copies.
 
 
 12
 The ICC's final implementing regulations, which the Commission issued in Single-State Insurance Registration, 9 I.C.C.2d 610 (1993), occasioned the disputes before us. The parties seeking review of the Commission's regulations fall into three groups: NARUC, as well as state petitioners and intervenors that had formerly participated in the "bingo card" program and therefore are eligible under Sec. 11506(c)(2)(D) to participate in the single-state system ("participating state petitioners"); state intervenors that did not participate in the "bingo card" program and are therefore ineligible to participate in the single-state system under Sec. 11506(c)(2)(D) ("ineligible state intervenors"); and petitioners and intervenors representing insurance industry interests ("insurance industry petitioners").
 
 
 13
 These three groups mount differing objections to the regulations. The participating state petitioners challenge the Commission's decision to have the motor carriers themselves--as opposed to the registration state--provide the copies of the registration receipts that are required by Sec. 11506(c)(2)(B)(ii) to be carried in each vehicle cab. See Single-State, 9 I.C.C.2d at 616-17. The ICC's copy rule, they argue, makes possible the infinite replication of the state-issued receipts that are intended to furnish evidence of compliance, and therefore is arbitrary and capricious in its disregard of state enforcement concerns. They also object to the ICC's decision that Sec. 11506(c)(2)(B)(iv)'s provision that participating states charge a fee "equal to the fee ... that such State collected or charged as of November 15, 1991" requires the continued observance of any discounted fee schedules that were in effect at that time under voluntary reciprocity agreements. See Single-State, 9 I.C.C.2d at 618-19.
 
 
 14
 The ineligible state intervenors, led by the Oregon Public Utility Commission (OPUC), challenge the ICC's conclusion, see id. at 628-30, that the ISTEA amendments preclude individual states from imposing insurance requirements beyond those provided for under the single-state system--such as, for example, that carriers be insured by an insurer registered to do business in the state. Congress never proposed, it is said, to alter the states' authority with respect to the qualifications of insurers covering activities within their borders. These intervenors also object to the ICC's determination that the single-state system is the exclusive mechanism for state filings and that, consequently, ineligible states may not require carriers to file either proof of insurance or notification of cancellation of insurance.
 
 
 15
 The insurance industry petitioners join the qualified state petitioners in challenging the ICC's copy rule. But as to the question whether nonparticipating states can require insurance filings, they join as intervenors on behalf of the ICC, supporting the single-state rule against assertions of state prerogatives to require filings independent of those provided for under the single-state regulations.[1]
 
 II.
 A. The Copy Rule
 
 16
 NARUC and the participating state petitioners claim that the ICC's decision to entrust the copying of the receipts to carriers is arbitrary and capricious because it is inconsistent with one of the evident purposes of the ISTEA amendments to Sec. 11506--to preserve state revenues. This purpose is implicit, they argue, in the statute's requirement that a copy of the carrier's registration receipt be kept in the cab of each vehicle. See Sec. 11506(c)(2)(B)(ii). This provision could only be directed at ensuring roadside enforcement of state fee requirements--a conclusion supported by the concern for preserving state revenues expressed in the legislative history. H.R.CONF.REP. No. 102-404, 102d Cong., 1st Sess. 437 (1991), reprinted in 1991 U.S.CODE CONG. & ADMIN.NEWS, 1526, 1679, 1817. The Commission's copy rule, petitioners maintain, necessarily undermines that objective. A copy is meaningful, after all, only if it indicates that the carrier paid a fee entitling it to operate the vehicle in question. And this link can exist only if copying responsibility is entrusted to the registration state, which would of course issue only as many copies as had been paid for by the carrier.
 
 
 17
 The ICC's rule decouples the connection between the number of copies in the hands of a carrier and the per-vehicle fees paid; under the ICC's policy, the number of copies available depends only upon the scruples of the carrier--and its incentives are clearly to under-pay and over-copy. Under the Single-State regulations, a roadside stop can prove nothing more than that a carrier did register some number of vehicles, although not necessarily the number that it operates, equipped with the required copy. In other words, without control over the copies, the states lose their capacity to police the number of vehicles registered by a carrier for use within their territory, and this incapacity is inconsistent with Congress' expressed intention to allow the states to charge fees on a per-vehicle basis.
 
 
 18
 The statute is silent as to whether the registration state or the carrier is to make the copies of the registration receipts that must be kept in each truck. The Commission accordingly argues that under Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837, 842-45, 104 S.Ct. 2778, 2781-83, 81 L.Ed.2d 694 (1984), we are obliged to defer to its regulations as a permissible interpretation of the statute. Perhaps because neither the wording of the statute nor the legislative history explicitly addresses the question of the assignment of copying responsibility, petitioners frame their arguments in terms of an arbitrary and capricious challenge rather than a claim of agency misinterpretation of the statute. Yet petitioners emphasize that the "Commission's analysis of congressional intent makes no sense"--because it assumes that "Congress did not intend, or was indifferent, that the [single-state system] be enforced." Implicitly then, if not directly, petitioners are arguing as well that the Commission has impermissibly interpreted the statute (Chevron Step II). See, e.g., Whitecliff, Inc. v. Shalala, 20 F.3d 488, 492 (D.C.Cir.1994). This is not surprising; the inquiry at the second step of Chevron overlaps analytically with a court's task under the Administrative Procedure Act (APA), 5 U.S.C. Sec. 706(2)(A) (1988), in determining whether agency action is arbitrary and capricious (unreasonable). See, e.g., General Am. Transp. Corp. v. ICC, 872 F.2d 1048, 1053 (D.C.Cir.1989) ("[T]he questions posed--has the Commission adopted an impermissible construction of the Act and is its ... policy arbitrary and capricious--are quite similar. Both questions require us to determine whether the Commission, in effecting a reconciliation of competing statutory aims, has rationally considered the factors deemed relevant by the Act."); see also Silberman, Chevron--The Intersection of Law & Policy, 58 GEO.WASH.L.REV. 821, 827-28 (1990). But cf. Continental Air Lines v. Department of Transp., 843 F.2d 1444, 1452 (D.C.Cir.1988) (although Chevron 's second step "sounds closely akin to plain vanilla arbitrary-and-capricious style review, ... interpreting a statute is quite a different enterprise than policy-making"). Whether an agency action is to be judged as reasonable, in accordance with the APA's general arbitrary and capricious standard, or whether it is to be examined as a permissible interpretation of the statute vel non depends, at least theoretically, on the scope of the specific congressional delegation implicated. The range of delegations extends from, at one end, a statute that simply charges an agency to act (e.g., to grant licenses) in the public interest to, at the other end, a painstakingly detailed and focused command. When Congress' instructions are conveyed at a high level of generality, an agency is not likely to consider its action as an "interpretation" of the authorizing statute, nor is that action likely to be challenged as a "misinterpretation." (Yet even then, the agency would be expected to assert that a particular decision was shaped by the general policy concerns that animated the legislation.) When, on the other hand, the statute is quite specific, agency action normally is evaluated in terms of how faithfully it follows the more detailed direction; in such cases the question is more obviously whether the agency permissibly interpreted the statute. In any event, the more an agency purports to rely on Congress' policy choice--as set forth in specific legislation--than on the agency's generally conferred discretion, the more the question before the court is logically treated as an issue of statutory interpretation, to be judged by Chevron standards.
 
 
 19
 The ICC thought that by amending the statute Congress had delegated to the Commission as its "primary role" the task of eliminating "as much of the paperwork and other compliance burdens [borne by carriers] as possible." Single-State, 9 I.C.C.2d at 616 (quoting H.R.CONF.REP. No. 102-404, 102d Cong., 1st Sess. , reprinted in 1991 U.S.CODE CONG. & ADMIN.NEWS 1526, 1679, 1818). By permitting carriers freely to copy the receipts issued by registration states, the ICC's regulations minimize the inconvenience to carriers in securing new copies whenever one is lost or stolen or needed for a new vehicle. Although the Commission recognized that the statute contemplated roadside enforcement (why else would the statute specify that a copy of the receipt be carried in each vehicle?), it deduced that Congress contemplated only "very basic" and not "more extensive" roadside enforcement (whatever that means). Id. at 617. For this reason, the ICC determined that if it were to issue regulations providing that only the registration state could copy the receipt, it would impermissibly "venture into the realm of assisting State enforcement efforts that Congress did not specifically address." Id. at 616.[2]
 
 
 20
 As the Supreme Court said in Chevron, 467 U.S. at 842-45, 104 S.Ct. at 2781-83, and as we have subsequently noted in several cases, e.g., Michigan Citizens for an Indep. Press v. Thornburgh, 868 F.2d 1285, 1293 (D.C.Cir.), aff'd by an equally divided Court, 493 U.S. 38, 110 S.Ct. 398, 107 L.Ed.2d 277 (1989); Baltimore Gas & Elec. Co. v. United States, 817 F.2d 108, 115 (D.C.Cir.1987), when legislation delegates to an agency the task of balancing conflicting policy objectives--as here, where the statute aims at reducing carrier burdens while preserving state registration revenues (the latter maintained through roadside enforcement)--an agency is entitled to a wide berth as to the accommodation it reaches. In this case, however, the agency purported to find in the statute a legal constraint on that balancing process that is simply not there. It is wholly artificial for the Commission to assert that for it to "assist" state roadside enforcement would contravene congressional intent. Nothing in the language of the statute or in the legislative history supports that extraordinary statement. To the contrary, we think that Congress' requirement that copies of the state-issued receipts be carried in each vehicle can reasonably be understood only as intended to aid state roadside enforcement. On that basis of incorrect statutory interpretation alone, we would be obliged to reject the Commission's reasoning. See Baltimore & O.R.R. Co. v. ICC, 826 F.2d 1125, 1129 (D.C.Cir.1987) (Commission cannot "assert a nonexistent congressional prohibition as a means to avoid responsibility for its own policy choice"); cf. Prill v. NLRB, 755 F.2d 941, 956-57 (D.C.Cir.1985).
 
 
 21
 To go on, however, the Commission is certainly entitled to give somewhat greater weight to the goal of easing the carriers' administrative burdens than to the competing statutory objective. In that regard, the Commission initially entertained the possibility that the registration states would be charged with supplying the required copies, in order to relieve the carriers of the paperwork burden--which at least suggests that entrusting copying to the states was not an obvious "burden" on carriers. It was only after the carriers strongly objected in the comment period ("please do throw me in the briar patch") that the Commission switched its position. Nevertheless, petitioners' argument--that the ICC's current rule effectively torpedoes state efforts at roadside enforcement--goes unrebutted. Apart from its statutory claim, the ICC observed only that the states could, "individually or collectively, audit carrier records, just as we do, to enforce compliance with the law." Single-State, 9 I.C.C.2d at 617 n. 5. But to put the states to the trouble of sending auditors out to determine whether any carriers had improperly made too many copies of the registration receipt--a seemingly quixotic quest--strikes us as not so much a balance of conflicting policy goals as the acceptance of one without any real consideration of the other. At minimum, the Commission must explain how such an alternative could possibly substitute, under any plausible cost/benefit analysis, for the traditional--and congressionally approved--method of roadside enforcement. As for the carriers' interests, the Commission failed in its Single-State rulemaking to explain the extent to which a carrier actually would be "burdened" in the event a copy was lost or stolen and replacement could only be had from the registration state. Id. at 617. It seems rather far-fetched to us that any copies, let alone a significant number, could be expected to be lost or stolen. Who else, after all, would want them? As for the supposed difficulty of securing replacements or additional copies for new vehicles, the states are capable of promptly delivering them.
 
 
 22
 In sum, it is hard to take the Commission's position seriously. We recognize that to some extent the contest between the participating states and carrier interests is a zero-sum game; but as the interests of each are implicated in the legislation--and the ICC has not asked us to conclude that Congress wanted only to appear to protect state revenue interests (which would be highly inappropriate)--we think it unreasonable for the Commission to favor the interests of one in a manner that wholly undermines those of the other. The Commission has, in our view, acted unreasonably whether one considers the case as one involving a question of Chevron Step II statutory interpretation or a garden variety arbitrary and capricious review or, as we do, a case that overlaps both administrative law concepts.B. The Reciprocal Fee Issue
 
 
 23
 We take a quite different view of the reciprocal fee arrangements. The statute directs the ICC to "establish a fee system ... that ... (III) will result in a fee for each participating State that is equal to the fee, not to exceed $10 per vehicle, that such State collected or charged as of November 15, 1991." 49 U.S.C. Sec. 11506(c)(2)(B)(iv). The ICC determined that participating states may not collect fees under the new system in excess of those charged and collected under preexisting reciprocity agreements. Single-State 9 I.C.C.2d at 618-19. NARUC and the qualified state petitioners complain that this decision unreasonably limits the states to charges that were assessed under circumstances not covered by the statute. Initially, the Commission had proposed to allow states to disregard their reciprocity agreements, in part out of concern that their continued observance would over-burden registration states, which would have to maintain complex schedules under which the fees collected on behalf of each participating state would be based on the location of the carrier. Later, however, in the Single-State rulemaking, the ICC changed its position, on the grounds that the first proposal "did not carry out the letter of the law that fees be frozen" and that, under the changed approach, "the potential burden on the States would be outweighed by the likely cost to carriers that could result were we to adhere to our prior position." 9 I.C.C.2d at 618. The Commission's about-face, petitioners argue, demands more explanation than the ICC has provided.
 
 
 24
 According to petitioners, the ICC cannot credibly assert that the statute clearly freezes prior state charges at levels below those authorized under state law because the Commission itself, they point out, initially read the statute differently. Therefore, the Commission should at least acknowledge that the words "collected or charged" are ambiguous, calling for agency construction in keeping with Chevron Step II. At that point, petitioners argue, the Commission should consider the anomaly that its construction would create if a state had previously charged more than was authorized or legal under state law. By capping fees by reference to the actual amounts charged, the Commission's rule would then allow a state to charge higher fees under the single-state system than it had previously been entitled to--contrary to all indications of congressional intent. The asserted anomaly is an illusion, however. Neither the statute nor the Commission's decision purports to authorize a previous charge that was illegally excessive under state law. Federal law merely states that the state may not charge more than was charged or collected in the past; we would think it obvious that no carrier would be obliged to continue paying a charge that was illegally excessive as a matter of state law at the time it was levied.
 
 
 25
 Besides, we think the Commission was correct in concluding that the plain language of the statute precludes petitioners' interpretation. It does not matter whether Congress actually focused on the reciprocal discount practice or even was aware of it. Nor is it of any significance that the Commission initially misread the statute; that is what comment periods are for.
 
 C. Intervenor's Arguments
 
 26
 We turn last to the claims presented by the ineligible state intervenors, led by OPUC, who assert that the ISTEA amendments did not empower the Commission to foreclose independent state regulation of certain insurance-related aspects of interstate trucking. OPUC challenges the Commission's decision, see Single State, 9 I.C.C.2d at 630, that nonparticipating states can neither require a carrier to file proof of insurance nor insist that its insurer be authorized to do business within their respective jurisdictions.
 
 
 27
 These arguments are not properly before the court. Intervenors may only argue issues that have been raised by the principal parties; they simply lack standing to expand the scope of the case to matters not addressed by the petitioners in their request for review. Illinois Bell Tel. Co. v. FCC, 911 F.2d 776, 786 (D.C.Cir.1990). We may, to be sure, in our discretion entertain arguments raised only by an intervenor on review if they have been "fully litigated in the agency proceedings and potentially determinative of the outcome of judicial review."." Synovus Fin. Corp. v. Board of Governors of the Fed. Reserve Sys., 952 F.2d 426, 433 (D.C.Cir.1991). But only in "extraordinary cases" will we depart from our general rule. Lamprecht v. FCC, 958 F.2d 382, 389 (D.C.Cir.1992).
 
 
 28
 Intervenors rely on Synovus in urging us to reach their arguments. But in Synovus, our decision to reach the intervenor's claim hinged on two critical aspects of the case. First, the intervenor had prevailed before the agency--but on grounds other than those it had argued--and by virtue of its victory was foreclosed from itself petitioning for review to vindicate its theory of the case; second, the intervenor's claim was that the agency in question lacked statutory jurisdiction for the actions it had taken, a question that neither of the principal parties raised (their dispute being over the exercise of agency discretion) but which was logically anterior to their case. See Synovus, 952 F.2d at 433-34.
 
 
 29
 Here, by contrast, none of the arguments presented by OPUC in any way affects the petitioners' claims or the ICC's responses; they are wholly removed from the case petitioners present. We have no reason to think that OPUC and its fellow state agencies intervened in an attempt to circumvent statutory deadlines for filing review petitions, but standing is not conferred by the absence of bad faith. Even a cursory reading of our case law makes clear that a party who seeks to challenge an aspect of agency action not questioned by any other petitioner must file a separate petition for review. See also New York v. Reilly, 969 F.2d 1147, 1154 n. 11 (D.C.Cir.1992); Platte River Whooping Crane Critical Habitat Maintenance Trust v. FERC, 962 F.2d 27, 37 n. 4 (D.C.Cir.1992). OPUC argues that its motions to intervene--which went unopposed--were filed at a time when it could have itself petitioned for review and that it has now missed the deadline for mounting an independent facial challenge against the ICC's regulations. That is regrettable but not unusual, and obviously were we to take that factor into account, we would fundamentally change our practice. Accord Washington Utils. & Transp. Comm'n v. FERC, 26 F.3d 935, 941 (9th Cir.1994); United States Gas Pipe Line Co. v. FERC, 824 F.2d 417, 435 (5th Cir.1987); Illinois Bell Tel. Co. v. FCC, 740 F.2d 465, 477 (7th Cir.1984).
 
 
 30
 * * *
 
 
 31
 For the foregoing reasons, we grant the petition for review of the ICC's rule giving carriers the authority to copy the registration receipts required by law to be kept in each vehicle. This provision of the regulations is remanded for further consideration by the Commission in light of this opinion.
 
 
 
 [1]
 Several groups representing trucking interests similarly intervened in support of the ICC on all matters at issue in this case
 
 
 [2]
 We confess to being confused as to why a rule that provided for official, state-issued copies would be significantly more effective from an enforcement perspective. None of the parties has explained precisely how such a system would operate, but unschooled as we are, it nevertheless seems to us that the number of official copies (all of which would be identical, see Sec. 11506(c)(2)(B)(i)) still could--indeed likely would--exceed the number of registered vehicles, and enforcement would therefore still be imperfect (although not completely without constraint). For example, an operator who registered 10 trucks for interstate use in Virginia and Maryland and 10 trucks for use in New Jersey and New York would be provided with 20 official copies--and thus could operate 20 trucks in all four states with impunity. Although certainly more restrictive than the existing rule, which would enable a carrier to operate any number of vehicles in all four states so long as one was registered for each, a state-issued copy rule would still allow for carrier manipulation. Both petitioners and the ICC, however, argue from an assumption that state copying would significantly advance state enforcement efforts, and therefore our misgivings (or confusions) do not affect our analysis