# United States Court of Appeals
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

---

Argued April 7, 2014                    Decided May 6, 2014

No. 13-1265

MONROE ENERGY, LLC,
PETITIONER

v.

ENVIRONMENTAL PROTECTION AGENCY,
RESPONDENT

PBF HOLDING COMPANY LLC, ET AL.,
INTERVENORS

---

Consolidated with 13-1267, 13-1268

---

On Petitions for Review of Final Agency Action of
the United States Environmental Protection Agency

---

*David W. DeBruin* argued the cause for petitioner Monroe Energy, LLC. With him on the briefs were *Marc A. Goldman* and *Matthew E. Price*.

*Robert A. Long Jr.* argued the cause for petitioners American Petroleum Institute and American Fuel & Petrochemical Manufacturers. With him on the briefs were *Kristen E. Eichensehr*, *Harry M. Ng*, *Chet M. Thompson*, *Robert Meyers*,

*David Y. Chung*, and *Richard Moskowitz.*

*Bart E. Cassidy*, *Katherine L. Vaccaro*, and *Bryan P. Franny* were on the brief for petitioner-intervenor PBF Holding Company LLC in support of petitioner.

*Lisa M. Bell* and *Brian H. Lynk*, Attorneys, U.S. Department of Justice, argued the causes for respondent. With them on the brief was *Robert G. Dreher*, Acting Assistant Attorney General. *Jessica O'Donnell*, Attorney, entered an appearance.

*David B. Salmons* argued the cause for respondent-intervenors. With him on the brief were *John C. O'Quinn*, *William H. Burgess*, *Sandra P. Franco*, and *Bryan M. Killian.*

Before: ROGERS, GRIFFITH and PILLARD, *Circuit Judges.*

Opinion for the Court by *Circuit Judge* ROGERS.

ROGERS, *Circuit Judge*: The petition for review challenges the 2013 Renewable Fuel Standards issued pursuant to section 211(*o*) of the Clean Air Act, 42 U.S.C. § 7545(*o*). *See Regulation of Fuels and Fuel Additives: 2013 Renewable Fuel Standards*, 78 Fed. Reg. 49,794 (Aug. 15, 2013) ("Final Rule"). These standards are part of Congress' effort "[t]o move the United States toward greater energy independence and security, to increase the production of clean renewable fuels, to protect consumers, to increase the efficiency of products, buildings, and vehicles, to promote research on and deploy greenhouse gas capture and storage options, and to improve the energy performance of the Federal Government." Energy Independence and Security Act of 2007, Pub. L. No. 110-140, 121 Stat. 1492 (2007); *see also Am. Petroleum Inst. v. EPA*, 706 F.3d 474, 479 (D.C. Cir. 2013). Monroe Energy LLC, joined by intervenor PBF Holding Company LLC, another independent petroleum refiner, contends that the rule must be vacated because EPA

declined to reduce the total renewable fuel volume, failed to address a malfunction of the credit system, and failed to promulgate the standards until more than eight months after the statutory deadline had passed. For the following reasons, we deny the petition for review.[1]

## I.

The Renewable Fuel Standards ("RFS") program was established by Congress in the Energy Policy Act of 2005, Pub. L. No. 109-58, 119 Stat. 594 (2005). It mandates the gradual introduction of renewable fuels into the U.S. supply of gasoline, diesel, and other transportation fuels. As amended in the Energy Independence and Security Act of 2007, Pub. L. No. 110-140, 121 Stat. 1492 (2007), the program requires an "applicable volume" of total renewable fuel to be sold or introduced into U.S. commerce each year. *See* 42 U.S.C. § 7545(*o*)(2)(B)(i). The volumes increase progressively through 2022; thereafter, EPA, rather than Congress, will set the applicable volumes. *See id.* § 7545(*o*)(2)(A)(i), 7545(*o*)(2)(B)(i). From each year's applicable volume of total renewable fuel, a certain volume must consist of "advanced biofuel," *see id.* § 7545(*o*)(1)(B), 7545(*o*)(2)(B)(i)(II), and this advanced biofuel quota must be met using specified minimum volumes of "cellulosic biofuel" and "biomass-based diesel" from among the various types of advanced biofuels, *see id.* § 7545(*o*)(1)(D)–(E),

---

[1] By post-argument motion of April 11, 2014, petitioners American Petroleum Institute and American Fuel & Petrochemical Manufacturers moved to sever their remaining challenges to the Final Rule, for lack of notice of EPA's use of updated EIA information and approval of a small refinery exemption. EPA joined the motion. The court deconsolidates case Nos. 13-1267 & 13-1268, and holds them in abeyance; this panel will retain these consolidated petitions for any further proceedings.

7545(*o*)(2)(B)(i)(III)–(IV). Annual "applicable volumes" are prescribed for four categories of fuel: total renewable fuel, advanced biofuel, biomass-based diesel, and cellulosic biofuel. *See id.* § 7545(*o*)(2)(A)(i). These categories are "nested": biomass-based diesel and cellulosic biofuel count toward the applicable volume for advanced biofuel, and advanced biofuel counts toward the applicable volume for total renewable fuel.

The obligation to meet the applicable volumes falls collectively to "refineries, blenders, and importers, as appropriate." 42 U.S.C. § 7545(*o*)(3)(B)(ii)(I). EPA determined in 2007, and reaffirmed in 2010, that blenders "who only blend[] renewable fuels downstream from the refinery or importer" are exempt from the requirements, leaving refiners and importers as the primary obligated parties under the RFS program. *See Regulation of Fuels and Fuel Additives: Renewable Fuel Standard Program*, 72 Fed. Reg. 23,900, 23,924 (May 1, 2007) ("2007 RFS"); *Regulation of Fuels and Fuel Additives: Changes to Renewable Fuel Standard Program*, 75 Fed. Reg. 14,670, 14,722 (Mar. 26, 2010) ("2010 RFS"). Pursuant to EPA regulations, refiners and importers must demonstrate that they have introduced into U.S. commerce an amount of renewable fuel that is proportional to their import or production of conventional fuel. *See* 40 C.F.R. § 80.1405(c). EPA determines the required proportion on an annual basis by dividing the statutory applicable volumes by the country's projected non-renewable gasoline and diesel use in the compliance year. *See id.* The result is a percentage standard informing each obligated party how much of its fuel production must consist of renewable fuels. For example, if the projected non-renewable gasoline and diesel use for a given year is 100 billion gallons and the applicable volume of renewable fuel is 15 billion gallons, the percentage standard will be 15 percent; a refiner that will produce 20 billion gallons of non-renewable fuel must ensure it also introduces an additional 15 percent of that amount (3 billion

gallons) of renewable fuel into U.S. commerce.

To afford obligated parties a degree of compliance flexibility, Congress also required a credit trading program be established whereby a party that produces more than the required quantity of renewable fuels can generate credits for the excess and use them, or transfer all or a part to another person, for purposes of compliance. *See* 42 U.S.C. § 7545(*o*)(5). The credits are valid to show compliance for "the 12 months as of the date of generation." *Id.* § 7545(*o*)(5)(C). Under the regulations, *see* 40 C.F.R. § 80.1415, 80.1426(e), each batch of renewable fuel that is produced or imported for use in the U.S. is assigned a set of "Renewable Identification Numbers" ("RINs") that correspond to the volume of ethanol-equivalent fuel gallons in that batch. (The per-gallon energy content varies among different types of fuels; all fuel volumes in this opinion are denoted in ethanol-equivalent gallons.) When a blender or obligated party blends renewable fuel into conventional fuel, the RINs from the blended renewable batch are deemed "separated" and may be traded in the market. *See id.* § 80.1426(e), 80.1429(b). Obligated parties must demonstrate their compliance with the renewable fuel standards by "retiring" RINs in an annual compliance demonstration. *See id.* § 80.1427(a). Prior to this demonstration, parties that have accumulated excess RINs may sell theirs to other parties, while obligated parties that have not generated sufficient RINs through their own activities may seek to purchase them. *See id.* § 80.1425–29. A party may also "bank" some of its RINs for use in the subsequent compliance year; up to 20 percent of a party's annual compliance obligation may be satisfied using such "carryover" RINs. *See id.* § 80.1427(a)(1), 80.1427(a)(5). Carryover RINs that are not so used will expire and become useless. *See id.* § 80.1427(a)(6).

In addition to allowing a deficit to be carried forward for one year under certain circumstances, *see* 42 U.S.C. § 7545(*o*)(5)(D), and addressing effects of seasonal variation, *see id.* § 7545(*o*)(6), Congress authorized EPA to waive the applicable volumes, in consultation with the Secretaries of Agriculture and Energy, after notice and comment, when "implementation of the requirement would severely harm the economy or environment," *id.* § 7545(*o*)(7)(A)(i), or "there is an inadequate domestic supply," *id.* § 7545(*o*)(7)(A)(ii). Of particular relevance here, when the actual production of cellulosic biofuel will fall short of the statutory quota, EPA is required to adjust the applicable volume of cellulosic biofuel to the "projected volume available during that calendar year." *Id.* § 7545(*o*)(7)(D)(i). If EPA reduces the applicable volume of cellulosic biofuel, then it "*may* also reduce" the required amounts of advanced biofuel and total renewable fuel "by the same or a lesser volume," but is not required to do so. *Id.* (emphasis added). Because the cellulosic biofuel industry has not developed as rapidly as Congress expected, EPA had to reduce the cellulosic biofuel quota in 2010, 2011, and 2012; EPA did not, however, exercise its discretion to reduce the advanced biofuel and total renewable fuel quotas in those years. *See generally* 2010 RFS, 75 Fed. Reg. 14,670; *Regulation of Fuels and Fuel Additives: 2011 Renewable Fuel Standards*, 75 Fed. Reg. 76,790 (Dec. 9, 2010) ("2011 RFS"); *Regulation of Fuels and Fuel Additives: 2012 Renewable Fuel Standards*, 77 Fed. Reg. 1320 (Jan. 9, 2012) ("2012 RFS").

In the proposed rule for 2013, EPA stated its intent to reduce the applicable volume of cellulosic biofuel from 1 billion gallons to 14 million gallons due to low anticipated production, but *not* to reduce the advanced biofuel and total renewable fuel quotas. *See Regulation of Fuels and Fuel Additives: 2013 Renewable Fuel Standards*, 78 Fed. Reg. 9282, 9285, 9295, 9301 (Feb. 7, 2013) ("NPRM"). Recognizing, however, that

there were "various uncertainties" in its projections and estimations, EPA requested comment on "whether and to what extent a reduction is warranted" and "whether the blendwall presents any difficulty in terms of compliance with the RFS volume requirements in 2013." *Id.* at 9286, 9301. EPA acknowledged stakeholders' concerns that the statutory quotas for total renewable fuel will become infeasible due to an infrastructure and market-related constraint on ethanol demand known as the "E10 blendwall." *See id.* at 9301. (This blendwall arises because most U.S. vehicle engines were not designed to handle gasoline consisting of more than 10 percent ethanol; exceeding that limit will void the engines' warranties.) Given that most renewable fuel in the U.S. is corn ethanol and that the applicable volumes for renewable fuel are increasing each year while total gasoline consumption is flat or declining, some suggested that the RFS program may soon require obligated parties to sell more renewable fuel than the U.S. market can absorb. Although many commenters supported the proposed standards, the petroleum industry commented that the standards were unrealistic and economically damaging, Comments of American Fuel & Petrochemical Manufacturers at 2–3 (Apr. 8, 2013), and urged EPA to reduce the cellulosic biofuel quota even further than was proposed, noting that in February 2013 the Energy Information Administration ("EIA") had "lowered [its] estimate" of cellulosic biofuel production, *id.* at 10. The national trade association also urged EPA to "waive the entire RFS" or "at a minimum," to "reduce the advanced and total [applicable] volume[s] so that the quantity of ethanol mandated is less than 10% of gasoline demand," *id.* at 2, pointing to a steep increase in RIN prices as evidence that the E10 blendwall had been reached, *see id.* at 4.

EPA maintained the statutorily mandated volume for total renewable fuel in the Final Rule but made other adjustments, including further reducing the applicable volume for cellulosic

biofuel from 14 million gallons to 6 million gallons in light of updated information from the producing companies and EIA. *See* 78 Fed. Reg. at 49,803. Based on updated EIA information, EPA also revised downward its projection of total gasoline and diesel use in 2013, which had the effect of slightly increasing the renewable fuel standards. *See id.* at 49,825 n.76, 49,826. EPA further adjusted the renewable fuel standards to account for a small refinery exemption that had been granted after publication of the proposed rule. *See id.* at 49,825–26. And, in light of the issuance of the Final Rule past the statutory deadline, EPA extended the 2013 compliance demonstration deadline to June 30, 2014. *See id.* at 49,799–800, 49,823. Monroe Energy petitions for review and PBF Holding Company intervenes in support.

## II.

Monroe Energy contends that EPA acted arbitrarily when it declined to exercise its discretion to reduce the 2013 applicable volume for total renewable fuel, thereby requiring use of more renewable fuel than the economy can absorb given the E10 blendwall. Moreover, Monroe Energy maintains, EPA's decision imposes substantial and disproportionate costs on independent refiners without serving any statutory purposes. Additionally, it contends the consequences of EPA's "irrational" rule, Monroe Energy Pet'r's Br. 12, are aggravated by EPA's tardiness in issuing the Final Rule after the statutory deadline had passed, depriving parties of the opportunity to adjust their production levels or else choose to export. Our standard of review is established under 42 U.S.C. § 7607(d)(9). *See also Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto Ins. Co.*, 463 U.S. 29, 43 (1983); *Nat'l Shooting Sports Found., Inc. v. Jones*, 716 F.3d 200, 214 (D.C. Cir. 2013).

9

**A.**

As a threshold matter, we address a challenge to Monroe Energy's standing under Article III of the Constitution. Respondent-intervenors — National Biodiesel Board, Biotechnology Industry Organization, Growth Energy, and Renewable Fuels Association — maintain that Monroe Energy's "brief makes clear that its claimed injury is the result of actions by third parties in response to economic and regulatory incentives — such as 'banking' or 'hoarding' RINs, or offering them at prices Monroe finds undesirable." Resp't-Intv'nrs' Br. 13 (citations omitted). They maintain that Monroe Energy cannot show causation or redressability because its theories depend on speculation about how third parties might react to different regulatory incentives.

The cases on which respondent-intervenors rely, such as *Simon v. Eastern Kentucky Welfare Rights Organization*, 426 U.S. 26, 40–46 (1976), and *Allen v. Wright*, 468 U.S. 737, 757–59 (1984), are not dispositive because they did not involve parties who were the direct objects of the government actions being challenged. *See Simon*, 426 U.S. at 42–43; *Allen*, 468 U.S. at 746, 757. Here, Monroe Energy is contesting its own compliance obligations under the RFS program as implemented in the Final Rule. *See Int'l Fabricare Inst. v. EPA*, 972 F.2d 384, 390 (D.C. Cir. 1992). Congress has established a renewable fuel program that includes a credit trading program for the benefit of obligated parties like Monroe Energy. Not only must Monroe Energy meet renewable fuel requirements subject to penalties for noncompliance, *see* 42 U.S.C. §§ 7545(d), 7524(b)–(c), respondent-intervenors acknowledge that Monroe Energy "must submit RINs to demonstrate compliance," Resp't-Intv'nrs' Br. 13. Whether RIN prices are high or low, and whether third parties play a role in determining those prices, is irrelevant to Monroe Energy's standing so long as RINs cost *something*. The more rigorous the fuel standards,

the more RINs Monroe Energy will have to purchase.

Because the financial burden of purchasing RINs is a cognizable injury-in-fact, and it is fairly traceable to the 2013 fuel standards and remediable by vacatur of the Final Rule, *see Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992), we hold that Monroe Energy has Article III standing to challenge the Final Rule.

**B.**

Turning to the merits, the Clean Air Act provides that if EPA reduces the cellulosic biofuel requirement, as it did here, then it "may also reduce" the advanced biofuel and total renewable fuel quotas "by the same or a lesser volume." 42 U.S.C. § 7545(*o*)(7)(D)(i). There is no *requirement* to reduce these latter quotas, nor does the statute prescribe any factors that EPA must consider in making its decision. *See id.* In the absence of any express or implied statutory directive to consider particular factors, EPA reasonably concluded that it enjoys broad discretion regarding whether and in what circumstances to reduce the advanced biofuel and total renewable fuel volumes under the cellulosic biofuel waiver provision. "[W]hen a statute is silent with respect to *all* potentially relevant factors, it is eminently reasonable to conclude that the silence is meant to convey nothing more than a refusal to tie the agency's hands." *Catawba Cnty., N.C. v. EPA*, 571 F.3d 20, 37 (D.C. Cir. 2009) (quotation marks and alterations omitted)*; see also Entergy Corp. v. Riverkeeper, Inc.*, 129 S. Ct. 1498, 1508 (2009); *Chevron, U.S.A., Inc. v. Natural Res. Def. Council*, 467 U.S. 837, 843 (1984).

EPA exercised its waiver discretion in a reasonable manner, focusing on "the availability of renewable fuels that would qualify as advanced biofuel and renewable fuel, the ability of those fuels to be consumed, and carryover RINs from 2012."

Final Rule, 78 Fed. Reg. at 49,797. EPA first determined that although production of cellulosic biofuel would be much lower than the statutory volume, the resulting shortfall in the advanced biofuel category could be made up using *other* types of advanced biofuel, particularly biomass-based diesel and imported sugarcane ethanol. *See id.*; *see also id.* at 49,812–20. This conclusion was supported by substantial evidence, including production estimates for biomass-based diesel, consideration of incentives produced by the reinstatement of the biodiesel tax credit, and an analysis of sugarcane ethanol trade with Brazil. *See id.* at 49,812–20. EPA reasonably decided that because the advanced biofuel quota could be achieved, the quota did not need to be reduced.

EPA next considered whether the total renewable fuel quota could also be met, taking into account the constraints imposed by the E10 blendwall. *See id.* at 49,820–22. Specifically, EPA estimated the volumes of ethanol and non-ethanol renewable fuel that could be used to satisfy the statutory requirement. *See id.* at 49,820. EPA concluded, based on conservative assumptions that were likely to "overstate the volume of ethanol that would have to be consumed," that 14.5 billion gallons of ethanol consumption would be necessary. *Id.* at 49,820–21. EPA acknowledged this figure was 1.4 billion gallons in excess of the projected blendwall; in other words, 1.4 billion gallons more than the consumer market would likely absorb. *See id.* at 49,821. EPA nevertheless concluded that an adjustment to the statutory volume for total renewable fuel was unnecessary because, in addition to the fact that these estimates represented an improbable worst case scenario, there were also more than enough carryover 2012 RINs in the market to enable obligated parties to demonstrate compliance. *See id.* at 49,821, 49,823. Indeed, the number of carryover RINs — more than 2.6 billion — was almost *double* the amount needed, even in the most pessimistic scenario. *See id.*

Intervenor PBF Holding Company lodges a statutory challenge to EPA's refusal to reduce the fuel quotas, maintaining that EPA was "unambiguously" required under 42 U.S.C. § 7545(*o*)(7)(D)(i) to look solely at the projected volumes of advanced biofuel and total renewable fuel that could be *consumed* in 2013 — not at other factors such as the existence of carryover RINs. This contention is meritless. As noted, the cellulosic biofuel waiver provision identifies no factors that EPA must or may not consider when making its decision; in light of that statutory silence, EPA was entitled to conclude, as it did, that it had wide latitude to consider a range of factors as appropriate. *See, e.g.*, *Catawba Cnty.*, 571 F.3d at 37. To the extent PBF Holding Company alternatively contends that EPA "did not clearly identify" the factors it considered, Pet'r-Intv'nr's Br. 29, that argument is beyond the scope of the issues raised by petitioners, *see Nat'l Ass'n of Regulatory Util. Comm'rs v. ICC*, 41 F.3d 721, 729 (D.C. Cir. 1994), and so not properly before the court.

Intervenor PBF Holding Company contends as well that EPA's consideration of 2012 carryover RINs is unreasonable because it "undermines the flexibility that Congress sought to preserve to obligated parties" through the RIN-trading system. Pet'r-Intv'nr's Br. 34. EPA explained, however, that "carryover RINs are a valid compliance mechanism" and a means for obligated parties to "protect[] against *any* potential supply shortfalls that could limit the availability of RINs." Final Rule, 78 Fed. Reg. at 49,822 (emphasis added). Further, EPA noted it was logical to assume that 2012 carryover RINs would be used for compliance in 2013 because otherwise they would expire and become useless. *See id.* EPA reasonably concluded that "the availability of carryover RINs [wa]s certainly relevant" to its decision whether to reduce the volume requirement for total renewable fuel. *Id.*

Monroe Energy's contention that EPA's decision to maintain the statutory volume for total renewable fuel is arbitrary because it does not serve "any statutory purpose," Monroe Energy Pet'r's Br. 14, also lacks merit. In the Final Rule, EPA identified several ways in which preservation of the requirement helps "*ensure*" that U.S. transportation fuel "contains *at least* the applicable volume[s]" prescribed in the statute. 42 U.S.C. § 7545(*o*)(2)(A)(i) (emphasis added). For example, maintaining the requirement would create "demand pressure" to increase consumption of E85 (a higher-ethanol blend of gasoline), which would in turn effectively 'raise' the blendwall. Final Rule, 78 Fed. Reg. at 49,821. Additionally, even assuming that the E10 blendwall imposes a firm cap on ethanol consumption, maintaining the statutory requirement for total renewable fuel would promote the use of *non-ethanol* renewable fuels such as biodiesel. *See id.* at 49,822. Respondent-intervenors point out that "[t]he volumes provide an incentive for continued investment and innovation," which "in turn, leads to reduced petroleum emissions and increased energy security benefits." Resp't-Intv'nrs' Br. 18.

Nor does Monroe Energy's contention that EPA wrongfully failed to consider an "important aspect of the problem," namely, obligated parties' incentive to bank 2013 RINs, Monroe Energy Reply Br. 5 (quoting *State Farm*, 463 U.S. at 43), withstand scrutiny. Although "EPA determined that 2.6 billion RINs have been carried over from 2012 into 2013," Monroe Energy maintains that "an even greater number of RINs — at least *three billion* — can be carried over from 2013 to 2014." Monroe Energy Pet'r's Br. 15. As a result, it claims that "the market will be 1.8 billion RINs short of what is needed for parties to comply in 2013, even after counting every banked 2012 RIN." *Id.* at 16. In its view, EPA analyzed only "one side of the equation," Oral Arg. 00:41–43, considering the carry-over of RINs from the *prior* year, but ignoring the carry-over of RINs into the

*subsequent* year.

In the Final Rule, EPA considered the likelihood that "those who own carryover RINs may opt to not sell them, instead carrying them over to help assure compliance with their own obligations in a future year." Final Rule, 78 Fed. Reg. at 49,822. EPA acknowledged that it was not possible to "determine what fraction of carryover RINs may fall into this category." *Id.* Nevertheless, even with parties' incentive to bank 2013 RINs, EPA concluded that "the blendwall w[ould] [not] represent an impediment to compliance in 2013 due to the availability of carryover RINs from 2012, opportunities for some increase in consumption of E85, and opportunities for non-ethanol biofuels." *Id.* at 49,823. EPA's reference to "those who own carryover RINs," *id.* at 49,822, could reasonably be understood in context to mean those who own 2013 RINs and would carry them over for use in 2014. Although EPA's analysis was not as robust at it might have been, the court "will uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned." *Bowman Transp. v. Arkansas-Best Freight Sys., Inc.*, 419 U.S. 281, 286 (1974). Two aspects of EPA's discussion bear out that it adequately considered the RIN-banking phenomenon of concern to Monroe Energy.

First, EPA recognized that obligated parties have "various alternative methods to comply" with the standards besides blending ethanol as E10. Final Rule, 78 Fed. Reg. at 49,822. For example, EPA explained that "there is unused biodiesel production capacity and sufficient feedstocks available to permit biodiesel production in excess of [the applicable volume] if demand for it exists." *Id.*; *see also id.* at 49,820. Because biodiesel is different from ethanol, its use is not limited by the E10 blendwall. EPA stated that "[a]s of February 2013, the aggregate production capacity of registered biodiesel plants in the U.S. was [approximately 4.2] bill[ion] gal[lons] per year

across 171 facilities" and that "[t]he biodiesel industry has demonstrated that it can increase production quickly under appropriate circumstances." *Id.* at 49,813. Moreover, EPA observed that the recent reinstatement of the biodiesel tax credit was expected to provide an "additional incentive to produce and consume biodiesel volumes in excess of" the required amount. *Id.* Respondent-intervenors note that EPA's projections were borne out: biodiesel RIN generation in 2013 totaled over 2.71 billion gallons, nearly 800 million higher than EPA's conservative estimate had assumed. *See* Resp't-Intv'nrs' Br. 21 n.12.[2] The magnitude of the purported RIN deficit is therefore not as large as Monroe now contends. *See* Monroe Energy Pet'r's Br. 16.

Second, recognizing the multi-year character of RIN-banking decisions, EPA postponed the 2013 compliance deadline until after the announcement of the 2014 fuel standards. *See* Final Rule, 78 Fed. Reg. at 49,823. EPA concluded (and Monroe Energy does not dispute) that the "primary driver" behind rising RIN prices was "anticipation of *future* scarcity." *Id.* at 49,822 (emphasis added). Indeed, Monroe Energy agrees with EPA that "[p]arties[] [were] apprehensi[ve] that, *going forward*, EPA would require them to demonstrate compliance with volume requirements that could not be achieved[.]" Monroe Energy Reply Br. 3 (emphasis added). To that extent, then, the complained-of RIN scarcity depends as much on what EPA might require in 2014 as it does on the challenged 2013 standards. The 2014 requirements determine the number of 2013 RINs that may be banked, as well as whether reliance on banked RINs will be necessary (as opposed to merely helpful) for compliance with obligations in 2014. If it were known that

---

[2] 2013 RFS2 DATA: RIN GENERATION SUMMARY, http://www.epa.gov/otaq/fuels/rfsdata/2013emts.htm (last visited Apr. 17, 2014).

2013 carryover RINs would *not* be needed for compliance in 2014, many of those carryover RINs would presumably become available for sale. EPA observed that "[k]nowledge of the volume requirements for 2014 is crucial to the strategies that obligated parties may implement when purchasing RINs and wet gallons of fuel for compliance with their individual 2013 [renewable volume obligations]." Final Rule, 78 Fed. Reg. at 49,823; *cf.* 2007 RFS, 72 Fed. Reg. at 23,903. EPA could reasonably conclude that sufficient RINs would be available for compliance in 2013 because EPA intended, before the 2013 compliance deadline, "to establish [2014] volume requirements that are *reasonably attainable*." Final Rule, 78 Fed. Reg. at 49,823 (emphasis added). These 2014 requirements would reflect "adjustments . . . to both the advanced biofuel and total renewable fuel categories" and would embody a "reasonable path forward that appropriately addresses the blendwall and other constraints." *Id.* In fact, EPA followed through on these commitments, proposing to reduce the 2014 applicable volumes for advanced biofuel and total renewable fuel in light of "both availability of qualifying renewable fuels and constraints on their consumption." *2014 Standards for the Renewable Fuel Standard Program*, 78 Fed. Reg. 71,732, 71,734, 71,737 (Nov. 29, 2013). Of course, the price of 2013 RINs might still be higher than Monroe Energy would prefer, because the owners of RINs might wish to rely on them to preserve compliance flexibility in the *next* year. But so long as sufficient RINs exist for obligated parties to meet the fuel standards, the court has no ground to conclude the 2013 standards are unlawful simply because RINs are costlier than in prior years, especially as high RIN prices should, in theory, incentivize precisely the sorts of technology and infrastructure investments and fuel supply diversification that the RFS program was intended to promote.

Still, Monroe Energy maintains that "even if compliance were feasible," EPA's rule imposes disproportionate hardship on

independent refiners, "who must acquire their RINs on the secondary market, and who therefore must pay . . . high and unpredictable prices for every RIN they need." Monroe Energy Pet'r's Br. 17–18. To the extent Monroe Energy contends that EPA could have eliminated the asserted "disproportionate" hardship on independent refiners by placing compliance obligations on blenders rather than on refiners and importers, that challenge is not properly before the court. It was not at issue in this rulemaking, and because the decision to place compliance obligations on importers and refiners, rather than blenders, was reaffirmed in 2010, *see* 2010 RFS, 75 Fed. Reg. at 14,722, the time to challenge that decision has passed, *see* 42 U.S.C. § 7607(b)(1); *Am. Road & Transp. Builders Ass'n v. EPA*, 588 F.3d 1109, 1115 (D.C. Cir. 2009); *Motor & Equip. Mfrs. Ass'n v. Nichols*, 142 F.3d 449, 460 (D.C. Cir. 1998).

## C.

Monroe Energy also seeks vacatur of the Final Rule because it was untimely issued. Section 211(*o*) required the 2013 renewable fuel standards to be issued no later than November 30, 2012, *see* 42 U.S.C. § 7545(*o*)(3)(B)(i), but EPA missed this deadline by many months. Monroe Energy therefore contends that EPA lacked authority to promulgate the 2013 standards and then to apply those standards "retroactively" to the entire compliance year. Even if EPA had such authority, Monroe Energy contends, alternatively, EPA exercised its authority unreasonably. Neither contention is persuasive.

In *National Petrochemical & Refiners Ass'n v. EPA*, 630 F.3d 145 (D.C. Cir. 2010), the court resolved the question of EPA's authority when EPA missed the statutory deadline for formally announcing the annual renewable fuel standards. There the national trade association challenged the 2010 RFS on grounds that missing the deadline divested EPA of authority to issue the fuel standards, and, alternatively, that the rule was

"impermissibly retroactive" and "violate[d] statutory lead time and compliance provisions." *Id.* at 147, 152. The court held that EPA had not forfeited its authority to promulgate the challenged standards, *id.* at 158, applying the well-established principle that "where there are less drastic remedies available for an agency's failure to meet a statutory deadline, courts should not assume Congress intended for the agency to lose its power to act," *id.* at 154 (citing *Brock v. Pierce Cnty.*, 476 U.S. 253, 260 (1986)). In section 211(*o*), Congress "directed EPA to 'ensure' that 'at least' the set volumes [of renewable fuel] were used each year," *id.* at 156; in light of that directive, and considering the overall statutory scheme and legislative history, the court concluded that it was "highly unlikely that . . . Congress intended . . . that EPA's failure timely to issue the . . . 2010 standard would lead to the drastic and somewhat incongruous result" of precluding EPA from fulfilling its statutory mandate, *id.* at 156–57 (quotation marks and citation omitted). The court also rejected the trade association's "retroactivity" challenge, holding that "any . . . retroactive effects were implicitly authorized under the [statute] and EPA reasonably balanced any retroactive effects against the benefits of applying the [fuel standard] regulations to the full calendar year." *Id.* at 162. The court dismissed the "lead-time" challenge as having no "meaningful difference" from the retroactivity challenge. *Id.* at 166.

Attempting to distinguish *National Petrochemical*, Monroe Energy points to the court's statement that "Congress anticipated the possibility of some retroactive impacts *in the first year* of the renewable fuel program." *Id.* at 163 (emphasis added). This disregards the broader issue before the court, namely, "Congress' focus on ensuring the annual volume requirement was met regardless of EPA delay." *Id.* That congressional "focus" is no less compelling here, notwithstanding Monroe Energy's contention, and so compels the same outcome. Indeed,

the "retroactivity" label may somewhat overstate the issue. *See id.* at 162. The statute set the renewable fuel obligation, and Monroe Energy had no legally settled expectation that EPA would exercise its waiver authority to reduce that obligation. *See* NRPM, 78 Fed. Reg. at 9295. Further, EPA finalized its standards during the compliance year, well before the compliance demonstration deadline, so the rule did not change the legal effect of a completed course of conduct. *Cf. Landgraf v. USI Film Prods.*, 511 U.S. 244, 280 (1994).

Alternatively, Monroe Energy contends that even if EPA had authority to act as it did here, EPA failed to exercise that authority in a reasonable manner. EPA acknowledged the lateness of the Final Rule and considered various ways to minimize the hardship caused to obligated parties, ultimately concluding that the best way to balance obligated parties' interest in regulatory certainty with EPA's statutory obligation to ensure the renewable fuel volumes are annually met was to extend the compliance demonstration deadline by four months to June 30, 2014. *See* Final Rule, 78 Fed. Reg. at 49,799–49,800, 49,823. Because EPA "anticipate[d] issuing a final rule establishing the 2014 RFS standards as soon as possible before that date," the extension was designed to give obligated parties an opportunity "to take their 2014 obligations into consideration as they determine how to utilize RINs for 2013 compliance." *Id.* at 49,800.

Monroe Energy's position that EPA should have waived the 2013 standards altogether because obligated parties needed advance notice in order to "make informed business decisions that w[ould] affect their compliance obligations," such as deciding "whether to reduce production of blendstock" and "whether to sell blendstock domestically . . . or export it," Monroe Energy Pet'r's Br. 25, ignores salient facts. Obligated parties had long been aware of the applicable volumes

prescribed in the statute.  *See* 42 U.S.C. § 7545(*o*)(2)(B)(i). They could readily have estimated their respective obligations using the EIA's October 2012 projections of fuel production and consumption.  *See* NPRM, 78 Fed. Reg. at 9286 n.4.  The only major point of uncertainty was whether EPA would reduce any of the applicable volumes pursuant to its waiver authority, and that uncertainty was eliminated when EPA stated in February 2013 that it was "not proposing to reduce the required volumes of advanced biofuel and total renewable fuel for 2013."  *Id.* at 9295.  Moreover, EPA counsel suggested that the delays in 2010 and 2013 arose because EPA was addressing "novel policy issues," whereas in the other years the final standards were promulgated on time or within weeks of the statutory deadline.  Oral Arg. 35:52–37:40.  All told, EPA's decision to preserve the 2013 fuel standards while extending the compliance deadline to June 30, 2014 was reasonable.  *Cf. Nat'l Petrochem.*, 630 F.3d at 162–63.

Accordingly, we deny Monroe Energy's petition for review.